Fran CRONIN, Individually, Fran Cronin, Trustee, of the Philip S. Cronin Irrevocable Trust, and Robert J. Albin, Trustee, of the Philip S. Cronin Irrevocable Trust, Plaintiffs,

v.

ZURICH AMERICAN INSURANCE COMPANY, A.T. Kearney, Inc., and Voluntary Accidental Death & Dismemberment Plan, Defendants.

No. 00 CIV 7599 AKH.

United States District Court, S.D. New York.

Feb. 19, 2002.

*OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT*

HELLERSTEIN, District Judge.

On October 8, 1998, on a business trip for his employer A.T. Kearney, Inc., Phillip Cronin was found dead in his hotel room in Helsinki, Finland. Cronin was found hanging by his neck, suspended from a luggage strap looped to a hook on the bathroom door. Immediately prior to his death, Mr. Cronin was practicing autoerotic asphyxiation. Plaintiffs, the decedent's wife and the trustee of his estate, bring this lawsuit against Zurich American Insurance Company and A.T. Kearney, Inc., to recover under two accidental death insurance policies. After discovery, defendants move for summary judgment dismissing plaintiffs' claims because, defendants argue, Cronin's death was not "accidental," and because it was a "purposely self-inflicted injury" excluded from coverage under the policy.

For the reasons explained below, I hold (1) that the insurance policies are "employee benefit plans," governed by ERISA and interpreted according to federal law, and (2) that Cronin's death was not accidental, and resulted from a "purposely self-inflicted injury."

## I. *Factual Background*

### A. *Cronin's Death*

Decedent Phillip Cronin was found dead in his hotel room in Helsinki, Finland on October 8, 1999, while on a business trip for his employer, defendant A.T. Kearney, Inc. ("Kearney"). Hotel personnel found Cronin hanging by his neck from a luggage strap suspended from a hook on the back of the bathroom door of his hotel room. According to investigators' reports, Cronin was found hanging naked in a sitting position, his buttocks suspended approximately 10 centimeters above the floor. The medical examiner concluded in the death certificate that the circumstances of Cronin's death suggested that it resulted from a botched autoerotic asphyxiation. Autoerotic asphyxiation is the practice of limiting the supply of oxygen to the brain in an attempt to heighten sexual pleasure, usually, as in this case, by exerting pressure on the arteries of the neck to constrict bloodflow to the brain while engaging in sexual self-stimulation, presumably masturbation.

### B. *Insurance Policies*

At the time of his death, Cronin was insured under two accidental death and dismemberment insurance policies issued by defendant Zurich American Insurance Company ("Zurich") through Kearney.[1] The first policy, referred to in Kearney's summary plan description as a "Business Travel Accident Insurance Plan," (hereinafter "the Travel Policy") provided accidental death and dismemberment coverage for all full-time Kearney employees while traveling on Kearney business. Kearney paid all premiums for the Travel Policy, and coverage for full-time employees was automatic and did not require any employee action or election. The travel policy had an original effective date of January 1, 1995, and was renewed by Kearney as of January 1, 1996 for three years.

The second policy, referred to in Kearney's summary plan description as the "Voluntary Accident Insurance Plan," (hereinafter "the Voluntary Policy") provided 24–hour–a–day accident insurance coverage to those Kearney employees who expressly elected coverage and paid premiums through paycheck deductions. The Voluntary Policy was effective from January 1, 1998.

For the purposes of this motion, the Travel Policy and the Voluntary Policy contain identical coverage provisions, obligating the insurer, "[i]f injury to a covered person results in a loss of life" to pay the sum of $500,000 per policy. Both policies define "injury" as an "accidental bodily injury."[2] "Accidental" is not defined. The Travel Policy and Voluntary Policy both contain identical exclusions, "not [to] pay any claim that is caused by, contributed to, or results from ... [a] purposely self-inflicted injury."

Both the Travel Policy and the Voluntary Policy were issued by Zurich to

---

1. Kearney also provided life insurance coverage as part of its employee benefit program. These policies are not in issue.

2. The full definition of "Injury" in the Policies is "an accidental bodily injury which is the direct result, independent of all other causes, of a hazard set forth in the 'Description of Hazards.'" Neither the primary policy language nor the Description of Hazards section defines "accidental."

Kearney as policyholder for the benefit of eligible employees. Kearney acted as Administrator, and distributed enrollment forms to employees, processed the forms, answered questions, and processed claims. Kearney also complied with various ERISA requirements by distributing summary plan descriptions and annual reports, and by filing "5500 forms" with the Internal Revenue Service. *See* 29 U.S.C. §§ 1002(1), 1021, 1024(b)(3); 26 U.S.C. § 1024(b)(3).

### C. *Denial of Cronin's Claim*

In January 1999, attorneys for plaintiff Fran Cronin, wife of the decedent Phillip Cronin, made a claim to Zurich under the two policies. Kearney's benefits department assisted with the submission and processing of the claim. Zurich conducted an investigation, and on June 28, 1999, Zurich denied the claim on two grounds: because the death did not result from an "accidental injury" and because the "purposely self-inflicted injury" exclusion applied. Plaintiffs appealed, exhausting Zurich's ERISA appeal procedure. On September 20, 1999, Zurich advised plaintiffs that its ERISA review committee had upheld the denial of plaintiffs claims. This lawsuit followed.[3]

### II. *Discussion*

#### A. *Summary Judgment Standards*

Summary judgment is appropriate if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95 (2d Cir.1998). On a motion for summary judgment, a district court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993). The initial burden of demonstrating the absence of a disputed issue of material fact lies with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this burden, the non-movant " must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### B. *Does ERISA Govern the Policies?*

 Before considering whether Zurich wrongfully denied plaintiffs' claims under the Voluntary and Travel Policies, it is first necessary to determine if the policies are "employee welfare benefit plans" as defined by section 3(1) of ERISA, 29 U.S.C. § 1002(1). This determination is significant for two reasons. First, if the policies are governed by ERISA, state law is preempted under section 514(a) of ERISA, 29 U.S.C. § 1144(a), which provides that ERISA supersedes state laws "insofar as they ... relate to any employee benefit plan." Thus, plaintiffs' sole remedy for denial of benefits would be under federal law. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Second, there is no right to a jury trial in a suit to recover benefits under an ERISA plan, since such suits are deemed equitable in nature. *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1258–59 (2d Cir.1996).

---

**3.** The plaintiffs contest the adequacy of the ERISA review committee's review process. However, because I am applying a *de novo* standard of review to Zurich's denial of the claims, I need not consider Kearney's or Zurich's appeal procedures.

■ Section 3(1) of ERISA, 29 U.S.C. § 1002(1), defines an "employee welfare benefit plan" as "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing participants ... accident, disability, [or] death ... benefits ...." Applying this definition, the Second Circuit has held that a " 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vermont*, 34 F.3d 148, 151 (2d Cir.1994).

Plaintiffs argue that the polices could not have been ERISA "plans" because the summary plan descriptions distributed by Kearney did not state the "remedies available under the plan for the redress of claims" as required by 29 C.F.R. § 2520.102–3(s), and that certain claim adjudication and review procedures mandated by ERISA did not exist, or were deficient. Defendants respond by arguing that both the summary plan descriptions distributed by Kearney, and the polices themselves, contained clear language describing how to file a claim, satisfying ERISA claim procedure requirements. Defendants also note that plaintiffs' own proper filing of claims under the policies with Kearney to forward to Zurich provides clear evidence that a claim procedure existed and was sufficiently communicated to Kearney employees.

Even if plaintiffs are correct that the claims processing mechanism was somehow deficient according to regulatory requirements, it does not change the fact that both the Travel Policy and the Voluntary Policy meet the *Grimo* test. For both policies, the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits are

entirely clear, both in the summary plan descriptions and in the language of the policies themselves. Because all four of these elements are met as to both the Voluntary and Travel Policies, both policies are "employee welfare benefit plans" under the Second Circuit's broadly inclusive interpretation of section 3(1). *See Conners v. Connecticut General Life Ins. Co.*, 1999 WL 1211831, at *1, 1999 U.S. Dist. LEXIS 19384, at *5 (S.D.N.Y. Dec. 16, 1999) ("[T]he purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established.").

■ This conclusion, however, does not end the inquiry. ERISA creates a "safe harbor" exception to this broadly inclusive definition of "employee welfare benefit plan" for certain insurance policy employee benefits. 29 C.F.R. § 2510.3–1(j) provides:

For the purposes of ... [ERISA], the term[ ] "employee welfare benefit plan" ... shall not include a group or group-type insurance program offered by an insurer to employees ... under which

(1) No contributions are made by an employer ...;

(2) Participation in the program is completely voluntary for employees ...;

(3) The sole functions of the employer ... with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees ..., to collect premiums through payroll deductions ... and to remit them to the insurer; and

(4) The employer ... receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable

compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions . . . .

Thus, the "safe harbor" exclusion from ERISA requires that all four criteria are satisfied.

The parties agree that this "safe harbor" exclusion does not apply to the Travel Policy since, under subsection (1), all premiums for the Travel Policy were paid by Kearney. Plaintiffs argue, however, that the Voluntary Policy meets all four criteria in the regulation and thus should not be considered an ERISA plan. Zurich concedes that the Voluntary Policy meets the criteria of subsections (1), (2) and (4) of the regulation, but argues that Kearney's administrative involvement in and endorsement of the Voluntary Policy excludes it from the "safe harbor" exclusion under prong (3) of the regulation.

In addressing this issue, several district courts have applied the Department of Labor's advisory interpretation of subsection (3), which provides that "[a]n endorsement within the meaning of 2510.3–1(j)(3) occurs if the employer . . . urges or encourages employee . . . participation in the program or engages in activities that would lead an employee . . . reasonably to conclude that the program is part of a benefit organization arrangement established or maintained by the employer . . . ." *See, e.g., Connecticut General Life Ins. Co. v. Mitchell,* No. 94 Civ. 4648(LAP), 1995 WL 469714 (S.D.N.Y. Aug. 8, 1995) (quoting DOL Advisory Op. 94–25A). In other words, an employer will have endorsed a plan for the purposes of the regulation if, "in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel

of the company's own benefit package." *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1135 (1st Cir.1995).

In arguing that Kearney's administration of the Voluntary Policy meets this standard, the defendants emphasize the following undisputed facts: (i) Kearney considered the Voluntary Policy an ERISA plan, (ii) Kearney distributed Summary Plan descriptions (iii) Kearney filed 5500 forms, (iv) Kearney sent Summary Annual reports to employees, (v) Kearney negotiated policy provisions to both the Travel Policy and the Voluntary Policy, including amendments to provide coverage for domestic partners, and to modify the minimum number of work-hours required for eligibility, (vi) Kearney was named as "plan administrator in" the Voluntary Policy's summary plan description, and (vii) Kearney exercised control over enrollment in the plan and could modify eligibility requirements.

Under the standard set forth in the Department of Labor's advisory opinion, and followed in *Mitchell* and *Johnson,* which focuses on the employee's belief as to whether the benefit at issue was an ERISA benefit plan, Kearney's involvement in and control over the policy amounts to "endorsement" for the purposes of subsection (3) of the safe harbor regulation. *Conners v. Connecticut General Life Ins. Co.,* 1999 WL 1211831 (S.D.N.Y. Dec. 16, 1999), supports this conclusion. In *Conners,* the court held that the employee benefit plan was not excluded from ERISA since the employer had the power to change or terminate benefits, was responsible as "plan administrator" for providing claims forms and guidance in filing claims, and determined employee eligibility; thus, subsection (3) of the safe harbor criteria was not satisfied. *Id.* 1999 WL 1211831, at *1, 1999 U.S. Dist. Lexis 19384 at *8–*9; *see also Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207,

1213–14 (11th Cir.1999) (holding subsection (3) inapplicable where employer picked the insurer, decided on key terms, deemed certain employees ineligible, incorporated policy terms into its summary plan description and retained the power to alter compensation); *Kanne v. General Life Ins. Co.*, 867 F.2d 489, 493 (9th Cir.1988) (finding that employer's intent to create ERISA plan amounted to "endorsement" for purposes of prong (3)).

Considering all the undisputed facts and circumstances, Kearney's administration of the Voluntary Policy was substantial: Kearney was the policyholder; Kearney distributed summary plan descriptions and summary annual reports as required by ERISA; Kearney filed 5500 forms with the IRS; Kearney had Zurich modify provisions in its employee insurance policies generally, including the Voluntary Policy; Kearney processed the initial stages of claims under the policy; and perhaps most importantly, Kearney offered the Voluntary Policy along with the other various plans in their overall "cafeteria plan" of employee benefits. Therefore, I hold that Kearney's treatment of the Voluntary Policy "would lead an employee ... reasonably to conclude that the program is part of a benefit organization arrangement established or maintained by the employer ...." DOL Advisory Op. 94–25A. Subsection (3) of the safe harbor regulation is not met; the Voluntary Policy is covered by ERISA; plaintiffs' state law contract claims are preempted; and plaintiffs have no right to a jury trial.

### C. Review of Zurich's Denial of Plaintiffs' Claim

#### 1. Standards of Review and Policy Interpretation

■ Because both the Voluntary and Travel Policies are "employee welfare ben-

efit plans" governed by ERISA, my review of Zurich's denial of plaintiffs' claims is governed by federal rather than state law. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 110, 109 S.Ct. 948. Defendants argue that my review of Zurich's interpretation of the insurance policies should be under an "arbitrary and capricious" standard. However, where an employee insurance policy governed by ERISA does not contain language which expressly gives the insurer discretion over interpretation of the policy, a district court's review of the insurer's original interpretation of the policy is *de novo*. *Id.* at 112, 109 S.Ct. 948. Especially where an insurer has an interest in the interpretation of the policy, which Zurich obviously does in this case, a district court owes the insurer's interpretation little or no deference. *Id.*[4]

■ Generally, federal law follows state law in applying established rules of contract interpretation in order to understand the terms and conditions of ERISA policies as long as they are not inconsistent with the policy of the federal statute. *Swensen v. Colonial Life Ins. Co.*, No. 91 Civ. 5793, 1993 WL 378470 (S.D.N.Y. Sept.22, 1993). Thus, "straightforward language in an ERISA-regulated insurance policy should be given its natural meaning." *Id.* (quoting *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir. 1989)). And the traditional rule of *contra proferentum* resolves ambiguities in policies against the insurer and in favor of the policyholder and his beneficiaries. *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 107 (2d Cir.1991).

#### 2. Was Cronin's Death "Accidental" Under the Policies?

■ Zurich's first rationale for denying coverage is that Cronin's death was not

---

**4.** Because I am reviewing Zurich's denial of plaintiffs' claims *de novo,* plaintiffs' argument that Zurich's review was not in accordance with ERISA requirements is irrelevant.

"accidental." Zurich argues that although Cronin may not have intended to kill himself, he intended, by self-asphyxiation with a luggage strap, to engage in self-pleasure at the risk of death. *See Runge v. Metropolitan Life Ins. Co.*, 537 F.2d 1157, 1159 (4th Cir.1976) (holding death by autoerotic asphyxiation with a noose was not "accidental" for purposes of accident insurance policy under Virginia law); *Sigler v. Mutual Benefit Life Ins. Co.*, 506 F.Supp. 542, 544 (S.D.Iowa 1981), *aff'd*, 663 F.2d 49 (8th Cir.1981) (same, under Iowa law).

Plaintiffs, relying on expert testimony that practitioners of autoerotic asphyxiation often have done so before without harmful consequence, argue that Cronin's death was accidental. *See Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir. 1995) (affirming district court's holding that autoerotic asphyxiation death was accidental under federal common law interpretation); *Bennett v. American Life Assurance Co. of New York*, 956 F.Supp. 201, 212 (N.D.N.Y.1997) (denying summary judgment for defendant insurance company based on factual issue concerning whether autoerotic death was accidental under federal common law interpretation); *Parker v. Danaher Corp.*, 851 F.Supp. 1287, 1295 (W.D.Ark.1994) (holding that autoerotic death was accidental under federal common law interpretation); *Connecticut General Life Ins. Co. v. Tommie*, 619 S.W.2d 199, 202–03 (Tex.Civ.App.1981) (upholding jury finding that autoerotic death was accidental for purposes of policy under Texas law).

I find that death from self-strangulation is not "accidental" and I side with the cases so-holding. The autoerotic asphyxiant may not intend his death, but he clearly wishes to put himself in a position that risks death's irreversible grasp. Restricting one's bloodflow to the brain with a strap in order to reduce conscious awareness and heighten sensation, thus to experience a sexual high—the tighter the restriction, the greater the high—creates an imminent danger that consciousness will be lost and death will result. One who purposefully creates the conditions of risk foresees the logical consequence of risk, and has to assume that he may not be able to manage those conditions so as to eliminate the risk he has created. An occurrence is not accidental if it results from a foreseen risk purposefully brought about.[5] Accidental death insurance policies are not underwritten to reward willful deviancies that risk the practitioner's own life.

### 3. "Self–Inflicted Injury" Exclusion

■ Zurich's second ground for denying coverage under the Travel Policy and the Voluntary Policy was that Cronin's death was "caused by, contributed to, or result[ed] from ... a purposely self-inflicted injury," and thus was expressly excluded from coverage. The issue is whether Cronin's purposefully inflicted self-inflicted asphyxiation was a "purposely self-inflicted injury" under a reasonable interpretation of the coverage exclusion in the Travel and the Voluntary Policies.

The experts agree that the autoerotic asphyxiant typically employs a rope or other ligature to put pressure on the neck, gradually constricting the passage of blood

---

**5.** The primary definition of "accident" given by Merriam–Webster's Collegiate Dictionary is "an unforeseen and unplanned event or circumstance." Merriam–Webster's Collegiate Dictionary (10th ed.2000). The Oxford English Dictionary defines "accidental" as "coming by chance," "undesignedly, or unexpectedly." Oxford English Dictionary Online, <*www.oed.com* > (last visited Feb. 12, 2002). The autoerotic asphyxiant may not intend death and may even expect to avert death, but the risk of death cannot be said to be "unforeseen" and cannot be said even to be "unexpected."

through the carotid artery to the brain, resulting in hypoxia (decreased oxygen in the blood) and hypercapnia (increased carbon dioxide in the blood). This induces "lightheadedness, loss of coordination, and the inability to appreciate the hazard of the situation." (Aff't, Donald T. Reay, Dec. 13, 2001, ¶ 5). At the same time, the practitioner engages in sexual self-stimulation and apparently seeks a heightened paroxysm of pleasure from his changed physiological state. (Aff't, Stanton C. Kessler, June 6, 2001, ¶ 4). If the practitioner retains his senses, and the experts maintain that most do, the pressure on the carotid arteries can be relieved in time to prevent permanent damage to the tissues of the neck or brain, and the body can recuperate. Dr. Stanton Kessler, plaintiffs' expert, states that persons who have engaged in the practice often have done so previously, without lasting harm or death, and do not expect death to result. *Id.* Death, however, is clearly a risk, especially in the light-headed state that results from the hypoxia and hypercapnia.

The effect on the brain produced by this activity is abnormal; the higher cerebral functions of thought, consciousness and awareness are compromised; and a dangerous loss of coordination and self-control results. Temporary cell damage results, and reduced brain activity occurs. (Aff't, Donald T. Reay, Dec. 13, 2001, ¶¶ 5–6; Aff't, Gerald F. Winkler, Jan. 10, 2002, ¶¶ 6–9). This loss of awareness and control in the search for an ever more intense high risks death, and limits the conscious ability to reverse death's grasp.

The handful of cases that have interpreted a self-inflicted injury exclusion in the context of autoerotic asphyxiation have reached conflicting conclusions under different legal standards. The majority have either implied or held outright that deaths from autoerotic asphyxiation are generally not covered if a policy contains a self-inflicted injury exclusion. One such group of cases includes those which held that a policyholder's death by autoerotic asphyxiation was "accidental," but suggested that coverage would have been denied if the policy at issue had incorporated an exclusion for self-inflicted injury. *Parker,* 851 F.Supp. at 1295; *Todd v. AIG Life Ins. Co.,* No. 3:93CV54–R, 1994 U.S. Dist. LEXIS 21539, at *22 (N.D.Tex. March 24, 1994), *rev'd on other grounds, Todd v. AIG Life Ins. Co.,* 47 F.3d 1448 (5th Cir.1995). Thus, in *Todd,* the district court ruled that death caused by autoerotic asphyxiation should be considered "accidental" because the insurer had neglected to exclude the practice. *Todd,* 1994 U.S. Dist. LEXIS 21539, at *22. Similarly, in *Parker,* the court held that an autoerotic death was accidental, but "hasten[ed] to say that [the court was] not faced in this case with an exclusionary clause for injury resulting directly or indirectly from an intentionally self-inflicted injury." *Parker,* 851 F.Supp. at 1295.

A second group of cases have held outright that death resulting from autoerotic asphyxiation was excluded from coverage because the policy contained a self-inflicted injury exclusion. *Sims v. Monumental Gen. Ins. Co.,* 960 F.2d 478, 480 (5th Cir. 1992); *Fawcett v. Metropolitan Life Ins. Co.,* No. C–3–97–540, 2000 WL 979994 (S.D.Ohio June 28, 2000); *Lonergan v. Reliance Standard Life Ins. Co.,* No. CV–96–11832–PBS (D.Mass. May 29, 1997) (unpublished opinion). The holding in *Fawcett,* however, was essentially an unwillingness to reverse the denial of the ERISA claim under an "arbitrary and capricious" standard of review, rather than *de novo.* Although the court recognized that other courts had found that reasonable minds could differ on the question whether the policyholder's intentional restriction of the flow of oxygen to his brain was a self-

inflicted "injury," it concluded that the insurer's denial of the claim under the exclusion was not arbitrary and capricious. *Fawcett*, 2000 WL 979994. In contrast, the *Sims* court, after considering undisputed expert testimony that partial strangulation for autoerotic purposes "damages tissues in the neck and deprives the brain of valuable oxygen," held under Texas law that the policyholder's act of hanging himself by the neck was indeed an "injury," as a matter of law, under a reasonable interpretation of the self-inflicted injury exclusion in the policy at issue. *Sims*, 960 F.2d at 481.

*Lonergan*, which reached the same holding, appears to be the only case reviewing a claim *de novo* under federal common law to hold that autoerotic death was excluded from coverage under an intentionally self-inflicted injury clause. In *Lonergan*, the policyholder was found dead after he had tied a karate belt around his neck with a slipknot and stood on an upturned bucket to engage in autoerotic activities. *Lonergan*, No. CV–96–11832–PBS, Memorandum and Order, at p. 7. Just as in this case, there were expert affidavits before the court, even one submitted by Dr. Kessler, one of the plaintiffs' experts in this case. The *Lonergan* court concluded however, as a matter of law, that the reduction of oxygen to the brain was itself an injury which the policyholder intentionally inflicted upon himself and was thus excluded from coverage under the "plain language of the policy." *Id.* at pp. 10–11.

In contrast, two state law cases found that self-strangulation practiced as part of autoerotic asphyxiation did not necessarily trigger the self-inflicted injury exclusion. In *Connecticut General Life Ins. Co. v. Tommie*, 619 S.W.2d 199 (Tex.Civ.App. 1981), a Texas appeals court upheld a jury verdict that autoerotic asphyxia, practiced

correctly, was not an injury in itself and therefore did not implicate the "self-inflicted injury" exclusion. *Id.* at 203. The court held that because there was record evidence before the jury that a temporary restriction of oxygen to the brain caused no permanent physical harm, they could reasonably conclude that the practice of autoerotic asphyxiation was not an "injury" for the purposes of the exclusion. *Id.* Similarly, *American Bankers Ins. Co. of Florida v. Gilberts*, 181 F.3d 931 (8th Cir. 1999), reversed a district court's grant of summary judgment in favor of the insurance company under Minnesota law because it could not conclude, as a matter of law, "that a reasonable insured would find that a temporary decrease in the oxygen level in the brain, of itself, is a bodily injury in the ordinary sense of the term." *Id.* at 933.

 I hold that the "purposely self-inflicted injury" exclusion encompasses Cronin's act of intentionally hanging himself by his neck with a luggage strap intending to deprive his brain of oxygen in order to achieve a sexual high. The clause is not ambiguous, as plaintiffs argue, and it is not capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *I.V. Servs. of America, Inc. v. Trustees of American Consulting Engineers Council Ins. Trust Fund*, 136 F.3d 114, 119 (2d Cir.1998) (quoting *O'Neil v. Retirement Plan*, 37 F.3d 55, 58–59 (2d Cir.1994)). A reasonably intelligent person would conclude that the "purposely self-inflicted injury exclusion" applies to situations where the policyholder causes a wrong to the integrity of his own body to cause himself "suffering or mischief willfully and unjustly inflicted." Oxford English Dictionary Online, <www.oed.com >, (last visited Feb. 12, 2002).[6]

**6.** *See also:*

"Hurt or loss caused to or sustained by a

**40**

Although Cronin may not have intended to cause himself *permanent* injury, his intention to restrict the flow of blood and oxygen to his brain in order to impair his mental processes was a "hurt" to his physical and mental being, and risked death. Causing oneself "hurt" or "harm" is an injury to one's own body whether inflicted in the search for delight or in the search for pain; both expose the practitioner to a substantially increased risk of accidental death. Cronin may have intended that the "mischief" he caused himself could be reversed by timely intervention, but his "hurt" so affected his state of being as to become irreversible. Under the plain language of the policy exclusion, Cronin's death was "caused by, contributed to, or resulted from a purposely self-inflicted injury."

### III. *Conclusion*

For the foregoing reasons, defendants motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted.

The Clerk of the Court shall mark this matter as closed.

SO ORDERED.

person or thing; harm, detriment, damage." Oxford English Dictionary Online, <*www.oed.com* >, (last visited Feb. 12, 2002). "Damage or harm done to or suffered by a person or thing," American Heritage Dictionary of the English Language (4th ed.2000). "Any damage or violation of, the person, character, feelings, rights, property, or interests of an individual; that which injures, or occasions wrong, loss, damage, or detriment; harm; hurt; loss." Webster's Revised Unabridged Dictionary (1996).
"Harm or damage," Black's Law Dictionary (7th ed.1999).