**Shirley M. CRITCHLOW, Plaintiff,**

v.

**FIRST UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

No. 00–CV–6168L.

United States District Court, W.D. New York.

March 29, 2002.

**320**

Christopher J. Calabrese, Rochester, NY, for plaintiff.

Paul K. Stecker, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY, for defendant.

*DECISION AND ORDER*

LARIMER, Chief Judge.

Plaintiff, Shirley M. Critchlow, commenced this action on April 14, 2000, under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Plaintiff alleges that defendant, First UNUM Life Insurance Company of America ("UNUM"), wrongfully denied plaintiff's claim for benefits under her a group accidental death and dismemberment insurance policy ("the policy") issued by UNUM to Redcom Laboratories, Inc. ("Redcom"), the employer of plaintiff's late son, Daniel Critchlow. Plaintiff, the named beneficiary under the policy, seeks an award of $50,000, the amount of the death benefit provided by the policy. Both sides have moved for summary judgment.

**FACTUAL BACKGROUND**

The relevant facts are undisputed. Prior to his death on February 26, 1999 at the age of thirty-two, the decedent was unmarried and living with plaintiff and decedent's younger sister in Palmyra, New York. He was employed by Redcom and was covered by the policy, which, with certain exceptions, provided for payment of benefits for death or dismemberment resulting from an "injury." Plaintiff's Ex. A.

Decedent was alone at his residence during the early evening hours of February 26, 1999. Around 8:45 p.m., his sister Deborah came home. She knocked on decedent's bedroom door, but there was no answer. The door was locked, but Deborah assumed that decedent was asleep.

Plaintiff returned home from a babysitting job around midnight. She also knocked on decedent's door and got no response. Worried that something might be wrong, she slipped the lock open using a knife and opened the door. Inside the room, plaintiff found her son lying face down on the floor, his nude body partially bound with rope. He was dead.

It is undisputed that decedent died while practicing "autoerotic asphyxiation," which is described in the coroner's report as a "dangerous form of sexual mannerism in which arousal is induced by depriving the brain of oxygen in one of several ways: hanging, strangulation, chest compression, covering the mouth and nose with a plastic bag or mask." Plaintiff's Ex. E. Although decedent had constructed a system of ropes and counterweights that was apparently intended to incorporate escape mechanisms, or otherwise to ensure that he did not die of asphyxiation, for whatever reason that system failed him on this occa-

sion. It does not appear, however, and UNUM makes no contention, that decedent intended or expected to die that evening, and there was evidence that decedent had engaged in this practice in the past.

Plaintiff applied for accidental death benefits on April 23, 1999. Plaintiff's Ex. F. On July 7, 1999, UNUM denied coverage. UNUM based that decision on two provisions in the policy, the first of which states that UNUM agrees to cover the insured for any loss described in Part I of the policy (including death), and that "[t]he loss must result directly and independently of all other causes from accidental bodily injury which occurs while this policy is in force as to the Insured, herein called 'injury.'" Plaintiff's Ex. A. UNUM stated that based on its investigation into decedent's death, it had concluded "that the death of the insured did not result directly and independently of all other causes from accidental bodily injury." Plaintiff's Ex. G.

UNUM also cited an exclusion stating that it would not pay if the loss were caused by "[i]ntentionally self-inflicted injuries." Plaintiff's Exs. A, G. UNUM stated that its "investigation further reveal[ed] that the death of the Insured falls within the above Exclusion for intentionally self-inflicted injuries." *Id.*

Plaintiff appealed that decision to UNUM's ERISA Appeals Committee. The Committee upheld the denial of plaintiff's claim on December 15, 1999.

## DISCUSSION

### I. Standard of Review

■ In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under [29 U.S.C. § 1132(a)(1)(B) ] is to be reviewed under a *de novo* standard unless the benefit plan gives the adminis-

trator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan." The Second Circuit has stated that "[w]here the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler v. First Reliance Std. Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir.1999) (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995)). The burden of establishing that the arbitrary-and-capricious standard applies is upon the plan administrator, since "the party claiming deferential review should prove the predicate that justifies it." *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 230 (2d Cir.1995).

■ In the case at bar, plaintiff contends that the court should conduct a *de novo* review of defendant's denial of plaintiff's claim for benefits, since the policy contains no language giving UNUM discretion to interpret the policy's terms or to determine eligibility for benefits. I agree. The policy provides simply that UNUM "will" pay for certain losses, and not for others. Such categorical language is indicative of a lack of discretion on the part of the administrator. *See MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia,* 32 F.Supp.2d 600, 605–06 (W.D.N.Y. 1999) ("One indication of the presence or absence of discretionary authority is whether the plan uses categorical or conditional language") (citing *Smith v. Rochester Tel. Bus. Mktg. Corp.,* 786 F.Supp. 293, 298 (W.D.N.Y.1992), *aff'd,* 40 F.3d 1236 (2d Cir.1994)); *see also Heidgerd v. Olin Corp.,* 906 F.2d 903, 908 (2d Cir.1990) (holding that statement in benefit plan that began, "Benefits are payable if ..." did not give administrators discretion, but that

another statement that "In some unusual cases, benefits may be payable ..." did grant discretion to interpret plan).

In any event, defendant appears to concede that *de novo* review is appropriate here. It has not argued for application of any other standard, and in its interrogatory responses has stated that it "does not intend under the law of this Circuit as it presently exists to claim that [UNUM] has been given discretionary authority." Plaintiff's Ex. W at 3.

## II. Consideration of Materials Outside the Administrative Record

In support of their cross-motion for summary judgment, plaintiffs have submitted affidavits and reports of two expert witnesses, which were prepared after defendant's final decision denying coverage, and which therefore were neither submitted to nor considered by the administrator. The first is by Robert M. Greendyke, M.D., who opines that "there was no 'injury' to the decedent, that was 'intentionally self-inflicted' which lead [sic] to his death." Plaintiff's Cross–Motion for Summary Judgment, Ex. 1 ¶ 8. The other is by Stephen J. Hucker, a Professor of Psychiatry and Head of the Division of Forensic Psychiatry at McMaster University in Hamilton, Ontario. Dr. Hucker states that he is of the opinion that decedent's death was accidental. Plaintiff's Cross–Motion, Ex. 2 ¶ 4.

At oral argument on the parties' motions on January 25, 2002, the court asked counsel for both sides to brief the issue of whether the court may, and should, consider these affidavits or any other material not submitted to the administrator. Having reviewed their submissions and considered the matter further, I conclude that the court should not consider these materials.

The Second Circuit has held that "the decision whether to admit additional evidence [beyond that in the administrative record] is one which is discretionary with the district court ...." *DeFelice v. American Int'l Life Assurance Co. of New York*, 112 F.3d 61, 66 (2d Cir.1997). The court has added, however, that "[e]ven where the district court exercises *de novo* review of the plan administrator's determination, the district court 'ought not' to accept additional evidence absent 'good cause.'" *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 646 (2d Cir.2002) (quoting *DeFelice*, 112 F.3d at 66).

Here, plaintiff has offered no good reason why she could not have submitted these or similar expert opinions to UNUM before UNUM rendered its decision on her claim for benefits. It appears that it was only after plaintiff got an adverse decision and decided to challenge that decision in court that she decided to seek out and present these expert opinions in order to strengthen her claim. Accordingly, I find that plaintiff has not demonstrated good cause why the court should accept or consider these submissions now. *See Zervos*, 277 F.3d at 647 (refusing to consider new information submitted by insurance company, since the record before the insurance company at the time it made its decision denying benefits was not incomplete; "The additional information that [the insurance company] obtained after Zervos filed this lawsuit appears to be aimed at bolstering its legal position and not at providing fuller review of Zervos' claim"); *Muller v. First Unum Life Ins. Co.*, 166 F.Supp.2d 706, 711 (N.D.N.Y.2001) (where additional statements which plaintiff sought to introduce were written to plaintiff's attorneys from two months to almost four and a half years after defendant closed its file, and plaintiff failed to articulate why those statements could not have been presented while his claim was pending, plaintiff failed

to demonstrate good cause to consider additional evidence, and review of his claim would be limited to the administrative record).

### III. Was Decedent's Death an "Intentionally Self-Inflicted Injury"?

■ Defendant contends that plaintiff is not entitled to benefits, on the ground that decedent's death fell under the exclusion for "intentionally self-inflicted injuries." Plaintiff asserts that the evidence shows that although decedent intentionally constricted his windpipe, that act itself did not cause any injury, since decedent could have performed that act (as he apparently had in the past) without suffering any injury. Since the "injury" here-decedent's loss of consciousness followed by his death-was not the intended result of decedent's actions, plaintiff contends that his injuries were not "intentionally self-inflicted."

Plaintiff's position strains logic and is not persuasive. She states in her memorandum of law that "[c]onstricting the wind pipe, while an intentional act, did not cause Daniel Critchlow any injury." It certainly did cause him injury, however; it led directly to his death. The cause of death was asphyxiation. Plaintiff's Ex. E. That asphyxiation was caused by decedent's intentionally constricting his windpipe so as to cut off or reduce the flow of oxygen to his brain. That it is possible to do so for a short period without causing lasting injury, or that injury or death does not immediately occur upon constriction of

the trachea, does not mean that decedent's intentional act caused him no injury. Decedent may have thought that he could free himself before he lost consciousness, but he was wrong. His death was nevertheless intentionally self-inflicted, given the serious and obvious risk of death entailed by decedent's intentional actions.

This result finds support in other cases that have addressed the question of whether death from autoerotic asphyxiation falls within the scope of a provision excluding "intentionally self-inflicted injuries," or containing similar language.[1] In *Sims v. Monumental Gen'l Ins. Co.*, 960 F.2d 478 (5th Cir.1992), *aff'g* 778 F.Supp. 325 (E.D.La.1991), the Court of Appeals for the Fifth Circuit held that a death from autoerotic asphyxiation was the result of an "intentionally self-inflicted injury," and therefore not covered by an insurance policy that, like the one in the case at bar, excluded such injuries. The *Sims* court reasoned that the fact that the decedent

> only intended partial strangulation and did not intentionally kill himself does not avail Mrs. Sims. The policy in this case not only excludes suicide, but also any loss (including death) "resulting directly or indirectly, wholly or partly from ... [an] intentionally selfinflicted injury." Partial strangulation is an injury in and of itself. His death "resulted directly or indirectly, wholly or partly from" that intentionally self-inflicted injury.

1. Although some courts have ruled that death from autoerotic asphyxiation may be covered under an accidental death policy, in most of those cases the policies at issue did not contain any exclusions for intentionally self-inflicted injuries. *See, e.g., Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1452 (5th Cir.1995) (noting that "there is no general exclusion for self-inflicted injury" in policy in that case); *see also Carson v. Metropolitan Life Ins. Co.*, 72 F.Supp.2d 725, 729 (W.D.Tex.1999) ("The

courts' analyses, and thus their ultimate determinations of whether the deaths were compensable in such cases, often turned on whether the insurance policies excluded deaths caused by self-inflicted injury"). The two cases of which the court is aware in which courts held that such an exclusion does not necessarily preclude coverage for death resulting from autoerotic asphyxiation are discussed below.

*Id.* at 480. By way of analogy, the court stated:

> If Mr. Brumfield had been a member of a fraternal organization that required him to brand his forearm, and he did so, any loss arising from the branding would be excluded. For instance, although he only intended to burn the insignia of the organization onto his skin, he might unintentionally burn into his muscle and do serious damage to his arm. He intended some injury, but another, unintended injury resulted. The loss would not be covered by the policy at issue here.

*Id.*[2] Likewise, decedent in the instant case intended to perform an injurious act-strangling himself, albeit not to the point of death-but another, unintended injury resulted: his death.

Similarly, in *Fawcett v. Metropolitan Life Ins. Co.,* No. C–3–97–540, 2000 WL 979994 (S.D.Ohio June 28, 2000), an ERISA case in which the decedent also died as a result of autoerotic asphyxiation, the district court held that even though the decedent's death appeared to have been "accidental" within the meaning of his insurance policy, the defendant insurance company properly denied benefits under an exclusion for intentionally self-inflicted injuries. In reaching that conclusion, the court stated that the decedent

> derived some sexual satisfaction from intentionally restricting the flow of oxygen to his brain, and he intended to live to enjoy it. His death was likewise unintended and, hence, accidental. Never-

theless, the action that he took to achieve the benefit was an intentionally self-inflicted injury that resulted in his death, despite his intentions to the contrary.

2000 WL 979994 *6. Although the issue in *Fawcett* was whether the insurance company had acted arbitrarily and capriciously in denying benefits, the court's reasoning nonetheless supports the conclusion that death by autoerotic asphyxiation constitutes an intentionally self-inflicted injury.

In *Sigler v. Mutual Benefit Life Ins. Co.,* 506 F.Supp. 542 (S.D.Iowa), *aff'd,* 663 F.2d 49 (8th Cir.1981) (per curiam)[3], the district court, applying Iowa law, concluded that the decedent's acts during autoerotic asphyxiation resulted in intentional injury, and that recovery was barred by an exclusion for "intentionally, self-inflicted injury of any kind." The court reasoned that

> [a]lthough Mr. Sigler did not intend to produce the unconsciousness that resulted in his death, his voluntary acts were intended to temporarily restrict his air supply to heighten the sensations of masturbation. Therefore, the elements of "intentionally, self-inflicted" are satisfied. The only question remaining is whether self-inflicted hanging is an "injury of any kind." The Court believes that it is. If someone else had placed Mr. Sigler in the same position as he placed himself to temporarily restrict his ability to breathe, it would have been an injury. In the Court's opinion, it contin-

---

2. Although *Sims* was a diversity action decided under Louisiana law, nothing about the court's holding suggests that it "rested upon any unique aspect of Louisiana law," or that a different result would have obtained had the case been decided under ERISA. *Fawcett v. Metropolitan Life Ins. Co.,* No. C–3–97–540, 2000 WL 979994 *6 (S.D.Ohio June 28, 2000).

3. The Court of Appeals for the Eighth Circuit affirmed the district court's order granting summary judgment for the defendant "on the basis of the district court's well-reasoned opinion ...." 663 F.2d at 50.

ues to be an injury even when it is self-inflicted.

*Id.* at 545; *see also Sims,* 778 F.Supp. at 328 ("if another party had choked off [the decedent's] air supply in the same fashion as he himself utilized, this Court would have found that [the decedent] had been injured").

Very recently, Judge Hellerstein of the Southern District of New York, applying *de novo* review to a denial of accidental death benefits in an autoerotic asphyxiation case, held that the policy's " 'purposely self-inflicted injury' exclusion encompasses [the decedent]'s act of intentionally hanging himself by his neck with a luggage strap intending to deprive his brain of oxygen in order to achieve a sexual high." *Cronin v. Zurich American Ins. Co.,* 189 F.Supp.2d 29, 39–40 (S.D.N.Y.2002). In reaching that conclusion, Judge Hellerstein reasoned that

> [a]lthough [the decedent] may not have intended to cause himself permanent injury, his intention to restrict the flow of blood and oxygen to his brain in order to impair his mental processes was a "hurt" to his physical and mental being, and risked death. Causing oneself "hurt" or "harm" is an injury to one's own body whether inflicted in the search for delight or in the search for pain; both expose the practitioner to a substantially increased risk of accidental death.

*Id.*

The court in *Cronin* also cited an unreported decision from the District of Massachusetts, *Lonergan v. Reliance Std. Life Ins. Co.,* No. CV–96–11832–PBS (D.Mass. May 29, 1997), a copy of which has been submitted by UNUM in this action. The *Lonergan* court, also reviewing a claim denial *de novo,* held that death from autoerotic asphyxiation was excluded from coverage under an intentionally self-inflicted injury clause. The court concluded that, as a matter of law, "partial strangulation is an injury in and of itself," and was thus excluded from coverage under the "plain language of the policy." *Id.* at **10–11.[4]

I find the reasoning of these cases persuasive. Decedent did not merely exert gentle pressure on his throat; he applied, or caused to be applied, pressure strong enough to cut off, or severely reduce, the flow of oxygen to his brain, to the point where loss of consciousness and death were certain to follow if the pressure were not soon relieved. Had another person done that to decedent, it would hardly be convincing for that person to contend afterwards that he had not intended to injure decedent, merely because he intended to release him before decedent lost consciousness or died.

There appear to be only two reported cases reaching contrary results, neither of which convinces me that a different result should obtain here. In *American Bankers Ins. Co. of Florida v. Gilberts,* 181 F.3d 931 (8th Cir.1999), the policy at issue provided that the insurance company would pay beneficiaries of the insured for, among other things, death resulting from a covered "injury," which was defined as a "bodily injury which is ... caused by an accident." The policy also specifically excluded a loss which resulted from "an intentional self-inflicted injury."

The district court in *Gilberts* had granted summary judgment to the insurance company, on the ground that the decedent's death from autoerotic asphyxiation

---

**4.** In another recent decision, the court in *Hamilton v. AIG Life Ins. Co.,* 182 F.Supp.2d 39, 49 (D.D.C.2002), held that it was not abuse of discretion for a plan administrator to decide that partial strangulation is an injury.

was the result of an intentional, self-inflicted injury which was excluded from coverage under the language of the policy and Minnesota law. On appeal, the Eighth Circuit reversed, holding that a question of fact existed as to whether the insured decedent's act of applying pressure to his throat so as to limit the flow of oxygenated blood to his brain was substantially certain to cause bodily injury, thus placing it within the exclusion for intentional self-inflicted injury.

The *Gilberts* court attempted to distinguish *Sigler* on the ground that the policy in *Sigler* precluded coverage for " 'self inflicted injury *of any kind*' rather than the more specific 'bodily injury' at issue" in *Gilberts*. 181 F.3d at 934. Reading those terms in context, however, I believe that this is a distinction without a difference. The term, "of any kind" implies that *all* self-inflicted injuries are excluded. Even without that modifier, however, there would be no reason to think that certain types of self-inflicted injuries are *not* excluded. The phrase "of any kind" in *Sigler* might have reinforced the inclusive nature of the term "self-inflicted injury," but I see no reason to read "intentionally self-inflicted injuries" in this case narrowly merely because that phrase is absent.

The court in *Gilberts* also drew a distinction between the act of partial strangulation and the result of that act, stating that though the act itself might constitute an injury as a matter of law, whether the "*result* of the act is a bodily injury in the ordinary sense of the term" presented a question of fact. I also find this reasoning unpersuasive. It is common knowledge that strangulation will result in death if it continues long enough (as it did here), and it is plain that the loss here-decedent's loss of his life-resulted directly from the intentionally-inflicted injury of self-strangulation.

The only other case that directly supports the view that autoerotic asphyxiation does not necessarily constitute an injury is *Connecticut Gen'l Life Ins. Co. v. Tommie,* 619 S.W.2d 199 (Tex.Civ.App.1981). As pointed out by the Fifth Circuit in *Sims,* however, the court in *Tommie* was reviewing a jury finding that partial strangulation did not constitute an injury under Texas law. Because the court found that "some probative evidence" introduced in the trial court tended to support the jury's finding, the appellate court was required to affirm. *Id.* at 203.

As in *Sims,* though, the record in the case at bar raises no genuine issue of material fact in that regard. The intentionally self-inflicted injury clause itself is unambiguous. Giving those terms their commonly understood and accepted meanings, I believe that the average person would certainly understand what it means to intentionally inflict an injury on oneself, and would also understand that deliberately strangling oneself falls within that category. *See Sims,* 960 F.2d at 480 ("Because we only need apply the unambiguous policy language to undisputed facts, this case is well suited to summary judgment"); *Cronin,* 189 F.Supp.2d at 39–40 ("The clause is not ambiguous, as plaintiffs argue, and it is not capable of 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement' ") (quoting *I.V. Servs. of America, Inc. v. Trustees of American Consulting Engineers Council Ins. Trust Fund,* 136 F.3d 114, 119 (2d Cir.1998)); *Bevans v. Iron Workers' Tri–State Welfare Plan,* 971 F.Supp. 357 (C.D.Ill.1997) ("This Court agrees that the exclusion for intentionally selfinflicted injury is not ambiguous"; holding that coverage for injuries resulting from overdose of painkillers was excluded under plan which excluded coverage for intentionally self-inflicted injury); *McLain*

*v. Metropolitan Life Ins. Co.*, 820 F.Supp. 169, 176, 179 n. 10 (D.N.J.1993) (terms "accident" and "purposefully self-inflicted injury" were not ambiguous; given their plain meanings, they were not subject to reasonable alternative interpretations; even applying *de novo* review, denial of benefits for death from cocaine overdose was appropriate).[5]

I also find no evidence in the record that would support a finding that decedent's death was not the result of an intentionally self-inflicted injury. In support of her position, plaintiff points to evidence that some persons practice autoerotic asphyxiation repeatedly, as well as physical evidence that decedent himself had engaged in this practice on more than one occasion prior to February 26, 1999. This evidence indicates that it is possible to engage in autoerotic asphyxiation without dying, or even without losing consciousness. From that evidence, plaintiff argues that such activity need not cause injury to the person engaged in it. That one *may* survive autoerotic asphyxiation without suffering any major injury is not dispositive, however. The fact remains that autoerotic asphyxiation, as practiced by decedent, requires not just a slight amount of pressure, or a negligible reduction of the flow of oxygen, but a significant deprivation of oxygen to the brain-in other words, strangulation. Any definition of "injury" that excludes strangulation-whether fatal or not-is simply unreasonable.

I am not persuaded by plaintiff's attempt to analogize decedent's death to death caused by a rockclimbing or skydiving accident. There is a difference between taking a controlled risk and flirting with death. Skydivers and rockclimbers do not set out to injure themselves, believing that they can stop the progress of the injury before it becomes severe enough to kill them.[6] In contrast, by constricting the flow of oxygen to his brain, to the point where loss of consciousness and death were certain to occur if the pressure were not released in a relatively short time, the decedent did injure himself. He simply believed (apparently) that he could bring that injury to a halt before the injury became life-threatening.[7] That his belief proved incorrect does not save plaintiff's claim.

## CONCLUSION

Defendant's motion for summary judgment (Docket Item 9) is granted, and the

---

**5.** I also note that because this language is unambiguous, my decision in this case would not be altered even if I were to consider the expert opinions submitted by plaintiff. To the extent that the experts' reports and affidavits-particularly those of Dr. Greendyke-assert the opinion that decedent did not suffer an injury that was intentionally self-inflicted, leading to his death, I find that they are inconsistent with the plain language of the policy exclusion, and therefore do not give rise to any issue of fact.

**6.** This is not to say that death from such activities could *never* be excluded under a policy like the one in the case at bar; there might be a set of facts in which a skydiver or other thrillseeker's actions presented such an imminent, patently unreasonable risk of death that death resulting therefrom might be considered an intentionally self-inflicted injury, or at least not accidental. *Cf. Wickman v. Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1089 (1st Cir.) (insured's death in 40– to 50– foot fall from bridge was not "accidental" within terms of accidental death policy; decedent reasonably should have expected serious injury when he climbed over guardrail and suspended himself high above railroad tracks below by hanging onto guardrail with only one hand), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).

**7.** My holding that decedent's death falls within the exclusion for intentionally self-inflicted injuries makes it unnecessary for me to decide whether it is also excluded on the ground that it was not accidental.

complaint is dismissed. Plaintiff's cross-motion for summary judgment (Docket Item 14) is denied.

IT IS SO ORDERED.