Karen Varta BABIKIAN,
Plaintiff–Appellee,

v.

The PAUL REVERE LIFE INSURANCE
COMPANY, Defendant–Appellant.

No. 93–56729.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1995.

Decided Aug. 14, 1995.

Gail E. Cohen and John M. LeBlanc, Barger & Wolen, Los Angeles, CA, for defendant-appellant.

Marian H. Tully, Law Offices of Marian H. Tully, West Covina, CA, Gary L. Tysch, Leibovic & Tysch, Upland, CA, for plaintiff-appellee.

Before FLETCHER, BRUNETTI, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

## OVERVIEW

The Paul Revere Life Insurance Company ("Paul Revere") appeals the district court's grant of summary judgment for Karen Varta Babikian, holding that it was obligated to provide Babikian with lifetime maximum benefits of one million dollars for treatment of her breast cancer. We reverse and remand.

## FACTS AND PROCEDURAL BACKGROUND

In August 1989, Paul Revere issued a group health insurance policy ("the group policy") insuring employees of IPC Films, Inc., and its affiliates. As an employee of Fonda Films, Inc., an affiliate of IPC and a participating employer, Babikian was insured by the group policy issued by Paul Revere. The group policy provides for an "individual lifetime maximum benefit" of one million dollars. It also provides that it terminates on the date the employee ceases working. Pursuant to the group policy's conversion privilege, an employee can obtain a converted, individual policy through Paul Revere ("the converted policy") in the event the group policy terminates. The group policy expressly provides that the benefits under the converted policy will not be the same as those under the group policy.

In July 1991, Babikian was diagnosed with breast cancer, and on December 1, 1991, her employment with Fonda Films ceased due to her illness. Babikian then applied for and received coverage under a converted, individual policy issued by Paul Revere which became effective on December 2, 1991. The converted policy, unlike the group policy, provided a lifetime maximum benefit of only $250,000.

In September 1992, Babikian filed suit in federal district court against Paul Revere, seeking a declaration that she is entitled to benefits as provided by the group policy. The district court granted summary judgment for Babikian. It held that her right to the medical benefits under the group policy vested at the time her cancer was diagnosed, and it rejected Paul Revere's argument that

the policy is an "expense incurred" policy which covers only medical expenses incurred pre-termination and precludes vesting. Alternatively, the court held that whether the group policy is an expense incurred policy is ambiguous, and it construed this ambiguity in favor of Babikian. Paul Revere timely appeals the district court's grant of summary judgment for Babikian. We reverse and remand.

## DISCUSSION

### A. Standard of Review

■ We review *de novo* the district court's summary judgment. *Serrato v. John Hancock Life Ins. Co.,* 31 F.3d 882, 884 (9th Cir.1994). We also review *de novo* "the district court's interpretation and application of ERISA provisions and its determination that ERISA preempts a state law." *Id.* (quotation omitted).

### B. Vested Rights in Continued Benefits Under the Group Policy

#### 1. Under California's Vesting Rule

The district court relied on *Fields v. Blue Shield of Cal.,* 163 Cal.App.3d 570, 209 Cal. Rptr. 781 (1985), to conclude Babikian had a vested right to continued benefits under the group policy. It held that California's vesting rule in *Fields* is not preempted by the Employee Retirement Income Security Act of 1974 (ERISA), § 1001 *et seq.*

■ The parties agree that the group policy is an employee welfare benefit plan governed by ERISA. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan"). ERISA preempts all state laws relating to such plans, with a few exceptions. *Henkin v. Northrop Corp.,* 921 F.2d 864, 867 (9th Cir. 1990); 29 U.S.C. § 1144(a). One exception is established by 29 U.S.C. § 1144(b), commonly referred to as the "savings clause," which provides that "nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." Pursuant to this section, if a state law regulates insurance, it is not preempted by ERISA. *Henkin,* 921 F.2d at 867.

"[A] state law 'regulates insurance' when it is limited to the insurance industry; has the effect of transferring or spreading a policyholder's risk; and relates to the policy itself." *Id.* (citing *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 743, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985)). We have previously held that "California's common law of contract interpretation is not specifically directed toward the insurance industry. Nor generally does it [a]ffect risk spreading or concern the policy relationship between the insurer and the insured beyond that to which the parties have agreed in the insurance contract." *Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489, 494 (9th Cir.) (as amended) (internal quotation, brackets and citation omitted), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989). Consequently, "California's common law of contract interpretation is not a law that 'regulates insurance,' and therefore is not saved from [ERISA] preemption." *Id.*

■ After the district court's decision in this case, we held that "*Fields* ... merely applies general rules of insurance contract interpretation." *Serrato,* 31 F.3d at 886. Further, we held that "ERISA preempts California's purported 'vesting' rule because it 'relates to' employee welfare plans. ERISA's savings clause does not apply because the state-law rule is not 'specifically directed toward the insurance industry.'" *Id.* at 887. Pursuant to our recent decision in *Serrato,* we hold that the district court erred in concluding California's vesting rule mandates vested benefits.

#### 2. Under the Written Terms of the Group Policy

However, despite the inapplicability of *Fields,* Babikian's benefits may still have vested pursuant to the written terms of the group policy. Although "[u]nder ERISA, health care benefits provided in an employee benefit plan are not vested benefits," *id.* at 884 (internal quotation and brackets omitted), ERISA does not forbid the vesting of health care benefits if the written terms of the contract provide for vesting. *See Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 605 (7th Cir.) (en banc), *cert. denied,* — U.S.

——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *see also Serrato,* 31 F.3d at 884 (noting insured failed to argue termination of benefits violated written terms). Thus, we address whether, under the written terms of the group policy, Babikian's benefits vested when she was diagnosed with breast cancer, and we conclude that they did not vest.

Our "interpretation of an ERISA insurance policy is governed by a *uniform* body of federal law." *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990) (internal quotation omitted). In developing a federal common law to govern ERISA suits, federal courts may borrow "from state law where appropriate, and [be] guided by the policies expressed in ERISA and other federal labor laws." *Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1502 (9th Cir.1985). In determining whether language is ambiguous, "[w]e interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Evans,* 916 F.2d at 1441 (internal quotation and brackets omitted). "We will not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Id.* (internal quotations and citation omitted). Further, we "examine[] the contract as a whole and if, on the face of the contract, two reasonable and fair interpretations are possible, an ambiguity exists." *Evanston Ins. Co. v. Fred A. Tucker & Co., Inc.,* 872 F.2d 278, 279 (9th Cir.1989). If an ambiguity exists, we must resolve it in favor of the insured. *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539–41 (9th Cir.) (adopting the well established doctrine of *contra proferentem* as federal common law), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990).

The district court held that the written terms of the group policy are ambiguous "as to whether the contingency insured against is illness or merely the resulting medical expenses," and it construed this ambiguity in favor of Babikian. In accord with this line of

reasoning, Babikian focuses on several provisions of the group policy, arguing they support her contention that the written terms of the group policy either provide for vesting or are at least ambiguous. We address each argument in turn.

■ First, Babikian relies on the policy language providing for an "individual lifetime maximum benefit" of one million dollars, defined by the policy as the "maximum benefit payable during an individual family member's [1] lifetime." She argues "[t]his language must mean that benefits will continue for the lifetime of the insured." We reject this argument. As one court has noted, the use of the word "lifetime" in a policy "does not create maximum lifetime coverage ... but rather defines the maximum benefit allowed if one is insured ... throughout his or her lifetime." *Sonneman v. Blue Cross & Blue Shield,* 403 N.W.2d 701, 705–06 (Minn.Ct.App.1987). In other words, the "individual lifetime maximum benefit" establishes a dollar limit, beyond which coverage does not continue, even though the insured remains employed and the policy remains in force.

■ Furthermore, focusing solely on the term "lifetime" to conclude Babikian's benefits vested at the time she was diagnosed with cancer would render superfluous those provisions of the policy providing for limited, post-termination benefits. *See id.* at 706 (rejecting interpretation of "lifetime" which would render post-termination benefit provisions meaningless). The policy has at least two such provisions. The "Extension of Benefits" provision provides that:

> We extend some medical care benefits if a family member is totally disabled and insurance terminates. We cover only medical expenses for the same injury or sickness that caused the family member to be totally disabled. We pay the same benefit that would have been payable had insurance not ended.

The policy then goes on to limit this post-termination coverage to a maximum of twelve months. Similarly, the policy's "Termination

---

1. The policy defines "family member" to include both the employee and the employee's dependents.

of Employee Insurance" provision also provides that:

> Employee insurance[2] terminates on the date ... the employee ceases work for the employer. If an employee ceases work because of injury or sickness, insurance may be continued as long as the employer pays the premium and this Policy remains in force. Any continuation of insurance must be approved by us and be based on rules which preclude individual selection. However, an employer may not continue insurance for more than eighteen months from the date the employee stopped working full-time.

Both of these post-termination benefit provisions contemplate a disability, injury or sickness diagnosed prior to the group policy's termination. Indeed, the "Termination of Employee Insurance" provision appears to have been written precisely for employees in Babikian's unfortunate position. If the group policy were intended to provide lifetime benefits for an illness or injury diagnosed during the period of coverage, then post-termination benefit provisions would be unnecessary. Their existence weighs heavily against concluding that Babikian's benefits vested when she was diagnosed with cancer. *See Fraker v. Sentry Life Ins. Co.,* 19 Cal. App.4th 276, 23 Cal.Rptr.2d 372, 375 (1993) ("[I]f the subject policy expressly provides ... for post-termination benefits under strictly limited conditions, no vesting of benefits has been found.").

Second, Babikian contends the language of the policy cannot be construed to limit coverage to medical expenses incurred pre-termination because no policy language expressly creates such a limitation. Regarding medical expenses covered, the policy provides that:

> WHAT WE PAY
>
> We pay the amount or percentage shown in the Schedule of Benefits for the covered hospital and medical expenses shown in this benefit. Covered medical expenses must be reasonable and customary and must be for the treatment of an injury or sickness.

WHEN WE PAY BENEFITS

> If a covered family member incurs covered medical expenses in a calendar year, we pay a benefit after the deductible has been met.

WHEN MEDICAL EXPENSES OCCUR

> The date on which a service is performed or a supply is furnished is the date expenses are incurred.

The policy defines "covered medical expenses" merely as "reasonable and customary charges." We agree Paul Revere could have easily stated expressly that the policy covered only medical expenses incurred prior to the policy's termination. However, failure to define "covered medical expenses" in this manner does not automatically result in the converse, *i.e.,* that the term "covered medical expenses" includes expenses incurred after the policy's termination. Instead, the fact that the policy focuses on the incurrence of medical expenses, opposed to the occurrence of an illness or injury, also weighs heavily against concluding Babikian's benefits vested upon her diagnosis with cancer. *See id.* 23 Cal.Rptr.2d at 374 ("If [the insured's] incurrence of medical expenses during the policy period was the relevant event, then this creates only pre-termination liability.").

Third, Babikian relies on language in the policy's deductible provision to argue her benefits vested. This provision provides that "[t]he deductible is the amount of covered medical expenses that a family member must pay before we pay benefits. A family member must incur these expenses while insured for this medical benefit." She argues that, because this provision states expenses must be incurred "while insured for this medical benefit" instead of "during the policy period," the provision implies benefits continue post-termination. We are not persuaded by this argument. A logical reading of the policy's deductible provision establishes only that an insured cannot attribute medical expenses paid prior to the policy's effective date towards fulfillment of the deductible amount.

---

**2.** The policy defines "employee insurance" as "the insurance for an employee provided by this Policy."

Fourth, Babikian argues that, because the policy covers catastrophic illness, it must provide for vested benefits. Like the district court, she reasons that, if an insured were to be diagnosed with a catastrophic illness, the insured would necessarily have to cease work, thereby terminating the policy. Consequently, coverage for catastrophic illness would be meaningless absent vested benefits. We are also not persuaded by this argument.

The practical effect of the combination of the policy's coverage of catastrophic illness and its termination in the event employment ceases (which will almost always occur in the case of an employee's catastrophic illness) is that, usually, only dependents of the employee will benefit from catastrophic illness coverage. Perhaps on first impression this result may seem odd because the employee, the one earning the right to participate in the plan, may not enjoy one of the policy's most beneficial provisions—coverage for catastrophic illness. However, this anomaly is not sufficient to create a genuine ambiguity in light of other provisions, such as the provisions for post-termination benefits, which indicate the policy does not provide vested benefits.

Unfortunately, reading the group policy as a whole, Babikian's argument, that its written terms provide for vesting or are at least ambiguous, must be rejected. We hold that, under the terms of the group policy, Babikian's benefits did not vest. No express language in the policy states it was intended to provide vested, lifetime benefits. Instead, the policy's language, read in the ordinary and popular sense, limits coverage to medical expenses incurred while the policy is in force. Our conclusion that Babikian's benefits did not vest is further buttressed by the fact that the policy expressly provides limited, post-termination coverage for employees in Babikian's position by allowing coverage to continue for up to eighteen months, as long as the employer continues premium payments.

Finally, relying on our decision in *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 386–87 (9th Cir.1994), Babikian argues she had a "reasonable expectation of coverage" under the group policy. In *Saltarelli,* only days after switching insurance plans, the insured was diagnosed with stomach cancer. His new insurance plan denied coverage based on its preexisting condition provision. This provision was not located in the plan summary, but instead, it could be "found only in the midst of the 'Definitions' chapter. Even then, it require[d] a coordinated reading of three separate definitions: those for 'Pre–Existing Condition,' 'Illness,' and 'Injury.'" *Id.* at 385 (footnote omitted). We held that "the lack of a clear, plain and conspicuous statement of the exclusion rendered it unenforceable." *Id.* at 386; *see also id.* at 387. The company was not allowed "to bury one of the plan's most significant provisions amidst definitions, rather than forthrightly stating the pre-existing conditions exclusion in the operative clauses of the plan description." *Id.* at 385.

Unlike the policy in *Saltarelli,* in this case the group policy's table of contents expressly refers to the significant, operative provisions of the plan. Under the heading "Definitions—General Provisions," "Termination of Employee Insurance" is listed. Under the heading "Medical Cost Management Benefit," "What We Pay" is listed. And finally, under the heading "Provisions Applicable to All Benefits," "Extension of Benefits" is listed. Because these provisions are clear, plain and conspicuous, we hold that Babikian had no reasonable expectation her benefits would vest. This conclusion is undeniable after reading the provision for "Termination of Employee Insurance" which details not only when the policy terminates, but the limited circumstances under which coverage may continue if an employee stops work due to an illness.

C. Disclosure of the Terms of the Converted Policy

Despite our conclusion that neither California's vesting rule nor the actual written terms of the policy entitle Babikian to vested benefits and that Babikian had no reasonable expectation of continued coverage, we hold that Paul Revere may still be required to provide Babikian with the benefits under the terms of the group policy. Relying on *Baker v. Washington Nat'l Ins. Co.,* 823 F.2d 156 (5th Cir.1987), Babikian argues she was not

informed of the reduced benefits of the converted policy. The district court did not address this argument because it determined Babikian's benefits under the group policy had vested. However, Babikian raised the issue in opposition to Paul Revere's motion for summary judgment, thereby preserving it for appeal. *See Self Directed Placement Corp. v. Control Data Corp.,* 908 F.2d 462, 466 (9th Cir.1990).

The insured in *Baker* participated in a group insurance policy which provided a conversion privilege in the event the policy was terminated. The policy stated only that "the company will issue its then current conversion policy to a person entitled to the conversion privilege." *Baker,* 823 F.2d at 157 (quoting group policy). When Baker ceased working, thereby terminating the group policy, his wife was three months pregnant. Baker applied for and received a converted policy; however, the converted policy did not include maternity benefits. *Id.* The court focused on the policy language providing for conversion and noted it was broad, general and failed to provide the form and content of the converted policy. *Id.* at 158. Relying on *Moore v. John Hancock Mutual Life Ins. Co.,* 436 F.2d 823 (5th Cir.1971), and *Aetna Life Ins. Co. v. Dunken,* 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924), the court held that "in the absence of any stated restriction, the insurer's use of general language agreeing to convert imports a promise to continue the basic coverage [under the group policy]." *Baker,* 823 F.2d at 157. Further, it held that:

> [I]f a company includes an undertaking to offer a conversion policy and its promise is no more definite than that it will issue an undisclosed, undefined form of conversion policy, it is bound to furnish at least one that is no less advantageous to the insured than the coverage it agrees to convert.

*Id.* at 159. As one court has noted, "the court [in *Baker* ] declined to adopt a standard method for insurance companies to utilize in apprising insureds of their conversion rights." *Ramsey v. Colonial Life Ins. Co. of America,* 843 F.Supp. 1103, 1111 (S.D.Miss. 1992), *aff'd,* 12 F.3d 472 (5th Cir.1994). Instead, the *Baker* court offered several suggested methods:

> A company can state in its contract that it will offer a specific level of coverage in its conversion policy as easily as it can omit any reference to providing a conversion privilege. It can attach the conversion policy it will issue to the group policy. It can refer to a form of conversion policy on file with the employer or the state insurance authority. It can delineate what particular risks it will cover or exclude in any conversion policy it may issue.

*Baker,* 823 F.2d at 159.

The group policy's language regarding conversion rights in this case can be distinguished from that in *Baker.* Unlike the group policy in *Baker,* Paul Revere's group policy indicates the benefits under a converted policy will be different. The group policy expressly states that "[t]he benefits provided under the converted policy are not the same as the benefits provided by [the group policy]." However, the exact difference between the two policies is not stated, except that the total amount payable under the converted policy will not be more than the total amount payable under the group policy. Significantly, the group policy does not state that benefits under the converted policy will be reduced.

To obtain specific details regarding the terms of the converted policy, the group policy required Babikian to request information from Paul Revere or her employer, which she did. On December 12, 1991, Debi Karolewski, an administrative assistant with Fonda Films, sent a request to Lori Sterritt at Paul Revere for information regarding converted benefits. In response to this request, according to Susan Risman, assistant counsel for Paul Revere, on December 18, 1991, Paul Revere sent Babikian a "Proposal for Conversion Benefits" and the "Benefit Summary" which clearly indicated the "lifetime maximum benefit" under the converted policy was limited to $250,000. However, according to Babikian, she does not recall receiving this information, but instead she claims only to have received a printout indicating her premiums would be higher. Also, according the Karolewski, prior to her writ-

ten request for conversion information, she contacted Eileen Rosenberg at Paul Revere who informed her that "there [were] no differences in coverage and that the only distinguishing feature between the two policies was that the premiums were significantly higher for the converted policy." Likewise, Babikian contends that prior to conversion, she was told there were no differences between the two policies, other than the premiums under the converted policy would be higher. Finally, if Babikian did not request an extension of coverage under the group policy's "Termination of Employee Insurance" provision, this failure buttresses her claim that she had been led to believe the benefits under the conversion policy would equal those under the group policy.

Because the group policy does not completely fail to address the benefits under a converted policy and directs Babikian to request information from Paul Revere or her employer regarding the extent of benefits under a converted policy, unlike the court in *Baker*, we do not hold that Paul Revere is automatically obligated to provide Babikian with the benefits under the group policy. However, we do hold that, if Paul Revere failed to provide Babikian with adequate information regarding the reduced benefits under the converted policy or to make such information readily available to her through her employer, she remains entitled to the benefits under the group policy. In light of the contradictory evidence regarding the information Paul Revere provided Babikian, we hold that a genuine issue of material fact exists whether Babikian was adequately informed of the converted policy's reduced benefits.

## CONCLUSION

In sum, we hold that neither California's vesting rule nor the terms of the group policy provide for vested benefits. Further, Babikian had no reasonable expectation of continued benefits. However, if Paul Revere failed to inform Babikian that the benefits under the converted policy would be reduced, she remains entitled to benefits under the group policy. Because a genuine issue of

material fact remains regarding this last issue, we remand to the district court.

REVERSED and REMANDED.