**Shirley M. CRITCHLOW,**
**Plaintiff–Appellant,**

v.

**FIRST UNUM LIFE INSURANCE CO.**
**OF AMERICA, Defendant–**
**Appellee.**

**Docket No. 02–7585.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 2003.

Decided Aug. 6, 2003.

As Amended Aug. 12, 2003.

Christopher J. Calabrese, Rochester, NY for Appellant.

Paul K. Stecker, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY for Appellee.

Before: VAN GRAAFEILAND, KEARSE and B.D. PARKER, JR. Circuit Judges.

Judge KEARSE dissents in a separate opinion.

VAN GRAAFEILAND, Senior Circuit Judge.

On February 26, 1999, David Critchlow, the thirty-two year old son of Shirley Critchlow, died as the result of autoerotic asphyxiation, i.e. strangulation by a self-imposed noose around his neck. The groove in David's neck that was caused by the strangulation is clearly visible in a postmortem photograph taken by the police, a tragic depiction that speaks for itself.

In the report of Dr. Ben Blecker, the prosecutor assigned in connection with the death, the Diagnostic and Statistical Manual of Mental Disorders, 3rd Edition, is quoted as follows:

> In DSM3R the current psychiatric diagnostic manual, asphyxiophilic (autoerotic asphyxiation) is classified as a particularly dangerous form of sexual mannerism in which arousal is induced by depriving the brain of oxygen in one or several ways: hanging, strangulation, chest compression, covering the mouth and nose with plastic bag or mask.

The danger inherent in this unfortunate practice is demonstrated by the fact that approximately 2000 deaths per year have been calculated to result therefrom. *See Lonergan v. Reliance Std. Life Ins. Co.,* No. CV–96–11832–PBS (D. Mass May 29, 1997).[1]

David's employer carried a group accidental death and dismemberment insurance policy with First UNUM Life Insurance Company which covered David and named Shirley as beneficiary of any award for David's death. The policy provided, however, that the insurer "will not pay if loss is caused by . . . intentionally self-inflicted injuries" and that a compensable loss "must result directly and independently of all other causes from accidental bodily injury."

There is no dispute concerning David's acts that preceded his death. He retired to his locked bedroom in his parents' empty house, disrobed completely and attached an intricate, home-made harness consisting of ropes, weights, and counter-weights leading to a noose around his neck. Doctor Blecker concluded in his report that David "died because of practicing so-called 'autoerotic asphyxiation'."

In a well-written and considered opinion, Chief Judge Larimer found that David's death was the result of a self-inflicted injury and granted First UNUM's motion for summary judgment. *See Critchlow v. First UNUM Life Ins. Co. of America,* 198 F.Supp.2d 318, 323 (W.D.N.Y.2002). The district court found the "intentionally self-inflicted injuries" clause to be unambiguous, and consequently concluded that it should be accorded its commonly understood, accepted meaning. *Id.* at 326. The district court rejected appellant's argument that because the decedent intended to constrict his windpipe, but did not intend to lose consciousness and die from asphyxiation, he did not die from "intentionally self-inflicted injuries." *Id.* at 323. The court found that decedent's intentional act of constricting his windpipe—with the purpose of depriving his brain of oxygen— indeed caused him injury: "it led directly to his death." *Id.* The court explained, "by constricting the flow of oxygen to his brain, to the point where loss of consciousness and death were certain to occur if the pressure were not released in a relatively short time, the decedent did injure himself. He simply believed (apparently) that he could bring that injury to a halt before the injury became life-threatening. That his belief proved incorrect does not save plaintiff's claim." *Id.* at 327.

■ We agree that the decedent's intentional act of constricting his trachea with the purpose of depriving his brain of oxygen—that is, strangulation—was an intentionally self-inflicted injury. Certainly, when the constriction produced a physiological effect on his brain and his body, an injury within the meaning of the exclusion occurred. *See Sims v. Monumental Gen'l Ins. Co.,* 960 F.2d 478, 480 (5th Cir.1992), *aff'g* 778 F.Supp. 325 (E.D.La.1991) (affirming denial of accidental death benefits under policy that excluded coverage for losses caused by "intentionally self-inflicted injur[ies]" where decedent had died from autoerotic asphyxiation; holding that "[p]artial strangulation is an injury in and of itself"); *Sigler v. Mutual Benefit Life Ins. Co.* 663 F.2d 49, 50 (8th Cir.1981) (per curium). And it is undisputed that decedent's injury caused his death. That decedent had engaged in this very activity on prior occasions without apparently serious

1. Similar calculations presented to the court below were 500–1000 deaths per year. However, no matter which figures are more nearly correct, the practice obviously is a dangerous one.

or permanent adverse consequences does not mean that the activity did not injure him, nor does the fact that he did not intend to die make the injury any less intentional.

We agree with the Fifth and Eighth Circuits that the deliberate constriction on one's windpipe with the purpose of depriving the brain of oxygen is an intentionally self-inflicted injury within the meaning of the policy's exclusionary clause. *See Sims,* 960 F.2d at 480; *Sigler,* 663 F.2d at 50. In reaching this conclusion, we do not, and need not, determine whether the death was also "accidental."

 We have reviewed appellant's remaining arguments and find them to be without merit.[2] Accordingly, we AFFIRM the district court's order granting appellee summary judgment and denying appellant's motion for reconsideration.

*Addendum*

VAN GRAAFEILAND, Senior Circuit Judge:

It is not a pleasant task to cross verbal swords with a judge as charmingly perspicacious as my colleague Judge Kearse. This is particularly true in the instant case, where I could accomplish the correct result simply by quoting Judge Edward Leavy's fine dissenting opinion in *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1130–34 (9th Cir.2002), the case upon which Judge Kearse so heavily relies. Judge Leavy cited four ERISA cases in which death resulting from autoerotic asphyxia-

tion was excluded from coverage because the policies at issue contained a self-inflicted injury exclusion. *Id.* at 1131. One of these is the case we now are reviewing. I add the following paragraphs to what I already have written only to emphasize our firm support for Judge Larimer's opinion despite Judge Kearse's opposition.

Judge Kearse's dissent herein consists in large part of excerpts from affidavits that are not part of the administrative record. Judge Larimer rejected these affidavits because the established law instructed him to do so absent good cause, and no good cause was shown. *Critchlow,* 198 F.Supp.2d at 322. Judge Kearse does not appear to challenge the propriety of Judge Larimer's discretionary decision to exclude these documents. So far as I can see, she simply ignores it.

The autopsy of the deceased, which was part of the evidence considered by the ERISA appeals committee, reads, in part, as follows: "There is blood on the face coming from mouth. Head is cyanotic. In the mouth there is masking tape with attached blue straps. Pharynx is hemorrhagic. ... There is a deep groove around neck." J.A. at 169. Moreover, the effects of the decedent's handiwork are plainly visible in the autopsy photographs that also are contained in the administrative record. Whether the gruesome effects thus depicted resulted from partial or complete strangulation, there can be no question that they were self-inflicted.

---

2. We conclude that the district court did not abuse its discretion in denying appellant's motion for reconsideration, in which it proffered expert affidavits that were not before the plan administrator and were outside of the administrative record. The court stated that its decision would not be altered even if it were to consider the affidavits; their assertions conflicted with the plain language of the policy exclusion and thus did not raise an issue of fact as to the nature of decedent's death. The decision whether to consider information outside the administrative record is a discretionary one even where there is "good cause." *See DeFelice v. American Int'l Life Assurance Co. of N.Y.,* 112 F.3d 61, 66 (2d Cir.1997). Because the court concluded that the affidavits would not alter its decision, it was not an abuse of discretion to deny the motion for reconsideration.

Judge Kearse argues that we err by failing to interpret the exclusionary clause at issue "in an ordinary and popular sense as would a person of average intelligence and experience." On the contrary, we hold, as did the district court, that when an individual purposely places a noose around his neck, purposely employs that noose to cut off his breathing, and ultimately dies from the very strangulation which he himself initiated, that person has dies of an "intentionally self-inflicted injury" as that term is ordinarily understood.

KEARSE, Circuit Judge, dissenting.

I respectfully dissent from the majority's affirmance of the district court's ruling that, as a matter of law, death during the practice of autoerotic asphyxiation, resulting from the decedent's miscalculation or from the malfunction of his escape apparatus, is "'caused by ... intentionally self-inflicted injuries,'" Majority Opinion *ante* at 132 (quoting insurance policy)—especially given the district court's observation here that plaintiff's son ("Critchlow") had set up elaborate "escape mechanisms ... to ensure that he did not die of asphyxiation," *Critchlow v. First UNUM Life Insurance Co. of America*, 198 F.Supp.2d 318, 320 (W.D.N.Y.2002) ("District Court Opinion"), and the majority's acknowledgement that Critchlow "had engaged in this very activity on prior occasions without apparently serious or permanent adverse consequences," Majority Opinion *ante* at 133.

The group accidental-death-and-dismemberment insurance policy issued by defendant First UNUM Life Insurance Co. ("First UNUM") covering Critchlow, which was part of an ERISA-regulated plan, provides that the insurer "will not pay if the loss is caused by ... intentionally self-inflicted injuries." An ERISA plan is to be construed in accordance with fed-eral common law. *See, e.g., Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Todd v. AIG Life Insurance Co.*, 47 F.3d 1448, 1451 (5th Cir.1995) ("*Todd*") (White, Associate Justice (Ret.), sitting by designation) ("Congress, in adopting ERISA, expected that 'a federal common law of rights and obligations under ERISA-regulated plans would develop.'") (quoting *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). The terms of such a plan are to be given their plain meanings. *See, e.g., Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) ("*Fay*"); *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 107 (2d Cir.1991); *Todd*, 47 F.3d at 1452 n. 1 ("'We interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience.'" (quoting *Meredith v. Allsteel Inc.*, 11 F.3d 1354, 1358 (7th Cir.1993))). Language in a plan "'is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire ... agreement.'" *Fay*, 287 F.3d at 104 (quoting *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 59 (2d Cir.1994)); *see, e.g., Babikian v. Paul Revere Life Insurance Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (in determining whether language is ambiguous, federal courts "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience" (internal quotation marks omitted)). Ambiguities in an ERISA plan's language are to be construed against the insurer. *See, e.g., Fay*, 287 F.3d at 104; *Kinstler v. First Reliance Standard Life Insurance Co.*, 181 F.3d 243, 251–52 (2d Cir.1999); *Babikian v. Paul Revere Life Insurance Co.*, 63 F.3d at 840; *Todd*, 47 F.3d at 1451–52.

In the present case, the majority states, citing *Sims v. Monumental General Insurance Co.*, 960 F.2d 478, 480 (5th Cir. 1992) ("*Sims*"), and *Sigler v. Mutual Benefit Life Insurance Co.*, 663 F.2d 49, 50 (8th Cir.1981) ("*Sigler*"), that it "agree[s] with the Fifth and Eighth Circuits that the deliberate constriction on one's windpipe with the purpose of depriving the brain of oxygen is an intentionally self-inflicted injury within the meaning of the policy's exclusionary clause." Majority Opinion *ante* at 133. *Sims* and *Sigler*, however, were not ERISA cases but rather were diversity actions controlled by state law. The Fifth Circuit itself, in dealing with an ERISA claim in *Todd*, noted that ERISA questions may be answered by resort to state law only to the extent that state law does not conflict with federal law, and it declined to follow *Sims* and *Sigler*, instead applying federal common law principles developed for claims asserted under ERISA. *See Todd*, 47 F.3d at 1453 & n. 4.

The only federal appellate decision of which I am aware that visits the question of whether a death occurring during the decedent's practice of autoerotic asphyxiation "was the result of an 'intentionally self-inflicted injury'" within the meaning of an insurance policy covered by ERISA is *Padfield v. AIG Life Insurance Co.*, 290 F.3d 1121, 1127–28 (9th Cir.) ("*Padfield*"), *cert. denied*, 537 U.S. 1067, 123 S.Ct. 602, 154 L.Ed.2d 556 (2002). The *Padfield* court stated that the answer to that question "hinge[d] on whether the physical consequences that Mr. Padfield intended were injuries. If they were injuries, and if they led to his death, the exclusion applies, and AIG correctly denied benefits." *Id.* at 1129. Applying the "federal common law of rights and obligations under ERISA-regulated plans," and "guided both by the subjective/objective analysis employed in other ERISA cases and by the mandate that ... provisions in an ERISA-governed policy [be read] in their ordinary and popular sense," *id.* at 1130 (internal quotation marks omitted), the court held that recovery under an ERISA policy for death during autoerotic asphyxiation "is not precluded by the exclusion for death resulting from 'intentionally self-inflicted injury,'" *id.; see also id.* at 1129 ("[A]utoerotic asphyxiation is not an intentionally self-inflicted injury.").

Under the subjective/objective analysis, [t]he court first asks *whether the insured subjectively lacked an expectation of death or injury. See Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1088 (1st Cir.1990) ("Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured."). *If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. See id.* If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

*Padfield*, 290 F.3d at 1126 (emphases added). The court noted that

[a]utoerotic asphyxiation is a repetitive pattern of behavior that individuals engage in over a period of years, and generally the intent of the individuals performing this act is not death .... *When performed successfully, the act results only in a temporary decrease in oxygen levels that causes light-headed-*

*ness, and usually does not leave visible marks on the neck.*

*Id.* (internal quotation marks omitted) (emphasis added). However,

> [b]ecause of equipment malfunction, errors in the placement of the noose or ligature, or other mistakes, accidental deaths sometimes occur. Data from the United States, England, Australia, and Canada indicate that one to two hypoxyphilia-caused deaths per million population are detected and reported each year.... But the use of asphyxia to heighten sexual arousal more often than not [has] a nonfatal outcome....

*Id.* at 1125–26 (internal quotation marks omitted); *see also id.* at 1127 ("death by autoerotic asphyxiation is statistically rare"); Hazelwood, Dietz & Burgess, *Autoerotic Fatalities* 49 (1983) (cited in *Padfield*, 290 F.3d at 1126, and *Todd*, 47 F.3d at 1457 (considering whether death during autoerotic asphyxiation was covered by a differently-worded ERISA-regulated policy that contained no general exclusion for death caused by self-inflicted injury)).

Applying these principles to the case before it, the Ninth Circuit ruled that Padfield had no subjective intent to injure himself.

> All of the evidence indicates that if the events ... had gone as Mr. Padfield intended, he would have experienced a temporary deprivation of oxygen, a euphoric light-headedness ... and an intensified sexual experience. His oxygen level would then have been restored, his euphoric state would have subsided, and he would have returned home uninjured. None of these consequences is an "injury" as that term is defined in the ordinary and popular sense [by] person[s] of average intelligence and experience.

290 F.3d at 1129 (internal quotation marks omitted). Padfield's death ensued because the events did not go as he had intended

and expected, although his expectation was reasonable:

> Autoerotic asphyxiation practitioners expect to survive the experience, and there is nothing to suggest that Mr. Padfield subjectively expected otherwise. Though the record is limited, it appears that Mr. Padfield had a history of engaging in this autoerotic behavior and surviving it.... Because death by autoerotic asphyxiation is statistically rare, his expectation of survival certainly was reasonable.
>
> Even if we could not determine Mr. Padfield's subjective expectations, the same conclusion would be warranted under a purely objective analysis because death is not the "substantially certain" result of autoerotic asphyxiation.... Given the uniform medical and behavioral science evidence indicating that autoerotic activity ordinarily has a nonfatal outcome, the likelihood of death from autoerotic activity falls far short of what would be required to negate coverage under an accidental death policy.

*Padfield*, 290 F.3d at 1127 (other internal quotation marks omitted). The court concluded that although

> Mr. Padfield voluntarily engaged in actions that led to a fatal injury, ... his reasonable expectation was that this behavior would not have resulted in "injury" as that word is commonly defined. Given both the usual pattern of autoerotic asphyxiation and the statements by Mrs. Padfield, the undisputed facts in this case show that Mr. Padfield, having performed the act in the past without inflicting any injury, had a reasonable expectation that he would be able to do so again. Thus, ... Mr. Padfield did not die from an intentionally self-inflicted injury .... Rather, he made a "fatal mistake." .... Generally, insureds purchase accident insurance for the very purpose of obtaining protection from

their own miscalculations and misjudgments.

*Id.* at 1130 (other internal quotation marks omitted); *see also id.* at 1129 ("voluntary risky acts resulting in injury are not necessarily acts that result in 'intentionally self-inflicted injury.' ").

In the present case, it seems undisputed that Critchlow's death was subjectively unexpected and unintended. The district court stated that "[i]t does not appear, . . . and UNUM makes no contention, that decedent intended or expected to die that evening . . . ." District Court Opinion, 198 F.Supp.2d at 321; *see also id.* at 324 ("unintended injury resulted: his death"). This conclusion is amply supported by the record. For example, in denying plaintiff's administrative appeal from the denial of benefits, First UNUM stated that "it is our belief that the evidence supports the conclusion that although the decedent, Daniel Critchlow, may have subjectively expected to survive the activity which caused his death, such expectation was not objectively reasonable." (First UNUM Letter to plaintiff dated December 15, 1999, at 1.)

Only the concession that Critchlow subjectively expected to survive, not the contention that his expectation was "not objectively reasonable" (*id.*), was in fact supported by First UNUM's motion for summary judgment. First UNUM submitted only the following evidence (along with two affidavits that merely introduced these documents) in support of its motion: (a) the insurance policy, (b) plaintiff's claim under the policy, to which were appended the relevant police and autopsy reports, (c) First UNUM's letters denying plaintiff's claim, and (d) two reports prepared by experts retained by plaintiff, to wit, a January 19, 2001 report by Robert M. Greendyke, M.D. ("Greendyke Opinion"), and a February 18, 2002 report by Stephen J. Hucker, Medical Director, Professor of Psychiatry, and Head of the Division of Forensic Psychiatry in the Forensic Program of McMaster University ("Hucker Opinion").

The Hucker Opinion stated, *inter alia,* that "[f]ortunately for most the experience of hypoxia ["a state of diminished oxygen supply to the brain"] may be survived with no obvious impairment or injury." (Hucker Opinion at 4.) The Hucker Opinion stated:

> Hypoxia, whether or not induced deliberately, as in cases of autoerotic asphyxia, does not, in my opinion, invariably lead to death or injury. Mr. Critchlow, in fact, died of prolonged hypoxia, a condition that he was trying to prevent.
>
> 5. In my opinion, therefore, Mr. Critchlow had expected to survive his autoerotic activities.
>
> 6. This expectation would have also been subjectively reasonable, based on his likely experience of having survived similar escapades in the past, and was *objectively reasonable* based on the knowledge that autoerotic asphyxial episodes do not, inevitably, or even substantially likely, lead to a fatal outcome.

(Hucker Opinion at 5–6, ¶¶ 4–6.) The Greendyke Opinion reached the same conclusion:

> [T]he circumstances conclusively indicate an accidental death resulting from a miscalculation or error in judgment in the course of deviant sexual behavior . . . .
>
> . . . [T]he risk-taking behavior which led to this death cannot be construed as a death wish. People engage in multitudes of possibly dangerous activities on a daily basis, ranging from auto racing to bungee jumping to DWI to alpine mountain climbing, to name a few, and occasionally die if something goes awry, without any claim of self-destructive intent. Simply said, in the heat of sexual excitement, Mr. Critchlow failed to guar-

antee his own safety. That his precautions had worked previously is quite clear from the evidence that his autoeroticism was not a first-time event but rather an elaborate, prearranged scenario. In other words he had no expectation of death, and that expectation was objectively reasonable, i.e. that death was not substantially likely to result from his conduct.

(Greendyke Opinion at 2; *see also id.* at 3 ("[D]eath was not a normal expected result of the behavior.").) First UNUM submitted no contrary expert opinions.

The Hucker and Greendyke Opinions submitted to the district court in the present case are entirely consistent with the medical and behavioral evidence discussed in *Padfield* and *Todd,* indicating that death by autoerotic asphyxiation is statistically rare and that the act, when performed successfully, results in a decrease in oxygen that causes only temporary lightheadedness and leaves no marks. The Fifth Circuit concluded that Todd's expectation of survival was objectively reasonable even though the record did not reveal whether Todd himself had ever engaged in that practice before. *Todd,* 47 F.3d at 1456. In the present case, the objective reasonableness of Critchlow's expectation that he would not die or suffer injury is further supported by the fact that Critchlow "had engaged in this very activity on prior occasions without apparently serious or permanent adverse consequences," Majority Opinion *ante* at 133.

The apparent linchpin of the district court's grant of summary judgment to First UNUM in the present case was its view that *"[p]artial* strangulation is an injury in and of itself." District Court Opinion, 198 F.Supp.2d at 323 (internal quotation marks omitted) (emphasis added). Even if partial strangulation, which itself does no serious or permanent damage, were properly to be considered an injury, the fact remains that Critchlow's death was not caused by "partial" strangulation. His death resulted from total strangulation. And although the majority appears to impute to Critchlow the goal of total strangulation, *see* Majority Opinion *ante* at 132 (Critchlow's "intentionally self-inflicted injury" was the "intentional act of constricting his trachea with the purpose of depriving his brain of oxygen—that is, strangulation"), that proposition is squarely contrary to the record, for Critchlow had set up a complicated escape mechanism "to ensure that he did not die of asphyxiation," District Court Opinion, 198 F.Supp.2d at 320.

Finally, I disagree with the majority's view that "when the constriction produced a physiological effect on [Critchlow's] brain and his body, an injury within the meaning of the exclusion occurred." Majority opinion *ante* at 132. Under that formulation, many activities and exercises would constitute "injury" such as to relieve the insurer of the obligation to pay for far less exotic accidents. Given that the physiological effects at issue here—absent an accident—are a temporary lightheadedness and euphoria with no serious or lasting adverse impact on one's health, I agree with the Ninth Circuit's ruling in *Padfield* that such nonserious, temporary effects are not what a reasonably intelligent person would ordinarily understand was meant by the word "injuries" in interpreting what is meant by death "caused by ... intentionally self-inflicted injuries." And to the extent that the term "injuries" in that phrase is ambiguous, it should, in accordance with ERISA principles, be construed against First UNUM.

In response to the Addendum's statement that this dissent "consists in large part of excerpts from affidavits that are not part of the administrative record," I point out that I have excerpted here only statements that appear in the majority

opinion, in the district court's opinion, or in papers submitted by the defendant First UNUM in support of its motion for summary judgment. In any event, with regard to the opinions of plaintiff's experts rendered after the administrative decision—which were first submitted to the district court *by First UNUM*—it is noteworthy (a) that the district court stated that its decision would not be different even if it considered plaintiff's experts' views, and (b) that those views merely serve to underline the district court's own statements that "[i]t does not appear ... that decedent intended or expected to die that evening," District Court Opinion, 198 F.Supp.2d at 321, and that Critchlow's "death" was an "unintended injury," *id.* at 324.

Accordingly, on this record I would reverse the grant of summary judgment in favor of First UNUM and rule that the district court should have granted the cross-motion for summary judgment made by plaintiff.