Silena BRETTELLE, Plaintiff,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA; Science Applications International Employee Welfare Benefit Plan, Defendants.

Case No. 09cv534 JM(WMc).

United States District Court, S.D. California.

March 8, 2010.

John P. Stennett, Stennett and Stennett, San Diego, CA, for Plaintiff.

Laura E. Fannon, Wilson, Elser, Moskowitz, Edelman & Dicker, San Francisco, CA, Russell H. Birner, Sherida A. Stroble, Wilson Elser Moskowitz Edelman & Dicker, Los Angeles, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT; DENYING DEFENDANTS' MOTION FOR JUDGMENT

JEFFREY T. MILLER, District Judge.

Pursuant to Fed.R.Civ.P. 52, Plaintiff Silena Brettelle moves for entry of judgment on her ERISA claim for plan benefits. Defendants Life Insurance Company of North America ("LINA") and Science Applications International Employee Welfare Benefit Plan (the "Plan") oppose the motion and cross-move for judgment in their favor on the ground that "no accident" occurred and therefore there is no liability under the accidental death policy. For the reasons set forth below, the court concludes that the death of Ms. Brettelle's husband was the result of an "accident" covered under the policy. Accordingly, the Clerk of Court is instructed to enter judgment in favor of Ms. Brettelle and against Defendants in the amount of the policy, $250,000.

## BACKGROUND

On March 17, 2009 Plaintiff commenced this action by filing a complaint for relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff seeks to recover the $250,000 death benefit under Group Accident Policy No. OK819515 (the "Policy") issued by LINA to Ms. Brettelle's employer, Science Applications International Corporation ("SAIC"), as part of the Plan. Plaintiff's late husband, Mr. David Tate, was an additional insured under the policy.

### The Policy

At the time of Mr. Tate's death, Ms. Brettelle was an employee of SAIC and enrolled as a participant in the Plan. (Compl.¶ 6, 7). Mr. Tate is an additional insured under the policy. (Compl. ¶ 7; Exh. 1). The benefit payable in the event of a covered accidental death is $250,000. The Policy contains the following insuring clause:

> We agree to pay benefits for loss for bodily injuries;
>
> a) caused by an accident which happens while an insured is covered by the policy; and
>
> b) which, directly and from no other causes, result in a covered loss (See the Description of Coverage.)

We will not pay benefits if the loss was caused by:

    a) sickness, disease, or bodily infirmity; or

    b) any of the Exclusions listed in the policy.

(Compl. Exh. 1; Administrative Record ("AR") 467). The policy does not define the term "accident."

### The Administrative Record [1]

On the afternoon of November 3, 2006, Mr. Tate helped some neighbors move out of an upstairs condominium unit. AR 213. Later than evening, Ms. Brettelle purchased pizza for those involved in moving out of the unit. AR 193. Sometime after 11:00 P.M., one of the men took a motorcycle to the store to purchase beer. When he returned, each of the men took turns riding the motorcycle around the neighborhood. At some point in time, Mr. Tate took his turn riding the motorcycle and did not return. AR 213.

"David Tate died on 11/14/2006 as a result of blunt force trauma from a motorcycle crash that occurred at 12:43 AM on 11/4/2006." AR 159. According to the only eye witness, Kyle Short, Mr. Tate was traveling northbound on Saxony Road in Encinitas, CA when he approached a curve in the road, traveling at an estimated speed of 90 MPH (the posted speed on that section of Saxony Road is 50 MPH, with a curve advisory speed of 35 MPH). AR 389, 392. Mr. Short observed the motorcycle veer to the right of the road, hit the curb, and flip over about ten times. *Id.* Mr. Short approached the downed rider to provide assistance and called 9-1-1. Mr. Tate told him that he could not feel anything and that "he should not have drank so much." *Id.*

On December 19, 2006 LINA received Ms. Brettelle's claim for benefits under the accidental death provision of the policy.

AR 446-47. LINA investigated the claim and obtained, among other things, Mr. Tate's medical records and the Traffic Collision Report. The Traffic Collision Report indicates that blood was drawn from Mr. Tate at 3:15 P.M. after one of the responding officers, Officer Miler, reported that he smelled the odor of an unknown alcoholic beverage from Mr. Tate's breath. The blood test revealed that Mr. Tate's alcohol level was 0.06% about two and one half hours after the collision. AR 402.

On March 20, 2008 LINA denied Ms. Brettelle's claim on the ground that the injuries suffered by Mr. Tate were not caused by an accident because they were the foreseeable consequence of driving at high speed while intoxicated. The letter also indicated that Mr. Tate's death occurred during the course of committing two felonies, i.e. receiving stolen property and vehicular manslaughter, and therefore coverage was excluded under the policy. Notably, LINA no longer argues that any policy exclusion applies.

On July 16, 2008, Ms. Brettelle, now represented by present counsel, appealed the denial of benefits. In connection with the appeal, Ms. Brettelle submitted photographs of the accident scene, DMV records showing that Mr. Tate never had a moving violation or been arrested for driving under the influence, statistics from the State of California showing the statistical correlation between driving while under the influence and being involved in a serious injury is significantly less than 1%, and a toxicological reported in which John Woodward opined that Mr. Tate's BAC at the time of the accident would most likely have been 0.04 to 0.05%. AR 173, 202-12. Ms. Brettelle also submitted a declaration from the eye witness, Mr. Short, who declared that he did not recall any discussion with Mr. Tate about drinking alcohol. AR 173.

---

1. The parties raise no evidentiary objections      to the administrative record.

LINA then sought review of the toxicology report by Frederick W. Fochctman, Ph.D., who ultimately opined that Mr. Tate's blood alcohol level at the time of the accident was about 0.10%. He also concluded in his report that Mr. Tate was likely impaired by alcohol at the time of the accident and that, under the influence of alcohol, "he exhibited greater risk taking by driving much faster than the speed limit." AR 136. Before LINA finalized its decision, Ms. Brettelle commenced this action and no further administrative action was taken on the claim.

## DISCUSSION

### Standard of Review

■ The parties agree that the standard of review is *de novo*. Under a *de novo* standard of review, the court looks to the terms of the plan and the evidence presented in the administrative record to determine whether a plaintiff's claim is covered under the policy. *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir.2007). The parties generally agree that the administrative record before the court is fully developed such that no additional evidence is necessary to conduct an adequate review of the record.

### The Claim to Accidental Death Benefits

■ Federal common law of ERISA applies to determine issues of insurance policy interpretation. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Under federal common law, the court must "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir.1995).

■ In the absence of a policy definition of "accident," the court is obligated to apply the test mandated by the Ninth Circuit under such circumstances:

A death or injury may be "deemed 'accidental' under a group accidental insurance policy established under ERISA if the death [or injury] was unexpected or unintentional." 10 Couch on Insurance § 139:16 (3d ed. 1995 & 2000 Supp.). In determining whether death, or the injury that caused death, was unexpected or unintentional, courts have undertaken an overlapping subjective and objective inquiry. The court first asks whether the insured subjectively lacked an expectation of death or injury. *See Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1088 (1st Cir.1990) ("Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured."). If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. *See id.* If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

*Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1126 (9th Cir.2002). The Ninth Circuit also discussed various formulations of the test, noting minimal distinctions between the formulations adopted by various courts, regardless of the phrasing used (i.e., some courts, like *Padfield*, have used the phrase if death is "not substantially certain" to result while others have used the phrase if death is "highly likely to occur"). *Id.* at 1127.

In *Padfield*, the insured told his wife that he was going to the cleaners and

drove away in the family's van. He never returned. Three days later, the California Highway Patrol located the van on an empty street, parked next to a vacant lot. The trooper approached the van and discovered Mr. Padfield dead on the back seat floor. Accordingly to the coroner's report, Mr. Padfield was discovered naked from the waist down with a necktie around his neck and the other end tied to the sliding door hinge. The coroner's report also noted that various sexual devices and pornographic materials were discovered in the van. The spouse of the insured told investigating officers that she knew of her husband's sexual devices but thought he had quit using them. The coroner concluded that the death appeared to be the accidental result of autoerotic asphyxiation. The insurer argued that the death was not accidental and invoked the suicide exclusion contained within the accidental death policy and denied the claim.

The district court concluded that the death was caused by an intentionally self-inflicted injury and therefore not covered by policy. In reversing, the Ninth Circuit looked to the reasonable expectations of the insured and asked whether the conduct at issue was substantially certain to result in death. The undisputed evidence revealed that autoerotic asphyxiation is intended to heighten sexual arousal, generally reflects behavior engaged in over a period of years and "the intent of the individuals performing this act is not death." *Id.* at 1126–27. Noting that death by autoerotic asphyxiation is statistically rare, the Ninth Circuit concluded that Mr. Padfield's death was accidental and therefore a covered event under the accidental death policy.

Numerous authorities have found that deaths involving motorcycle or automobile collisions driven by alcohol-impaired drivers with far higher BAC levels than those involved here to be accidental deaths un-

der ERISA common law. For example, in *King v. Hartford Life & Accident Ins.,* 357 F.3d 840 (8th Cir.2004), *rev'd en banc on other grounds,* 414 F.3d 994 (2005), the insured motorcycle driver left a bar in the early morning hours with a BAC of 0.19%. The driver did not put on a helmet, drove too fast around a curve, and died from brain injuries caused by the impact. *Id.* at 841. The district court determined, under an abuse of discretion standard of review, that death was a foreseeable outcome of driving a motorcycle while intoxicated and denied benefits. The Eighth Circuit reversed. In applying the subjective/objective test, the court concluded that only a small percentage of drunk driving instances result in death and therefore concluded that death was not "highly likely" to occur. *See also Kovach v. Zurich American Ins. Co.,* 587 F.3d 323 (6th Cir.2009) (notwithstanding motorcyclist's BAC of. 148% and the running of a stop sign, the insured is entitled to accidental disability benefits); *West v. Aetna Life Ins. Co.,* 171 F.Supp.2d 856 (N.D.Iowa 2001) (insured automobile driver entitled to accidental benefits where insured driver crashed into a tree, had a 0.20% BAC, and did not wear a seatbelt because of the relatively small probability of intoxicated drivers being involved in a fatal or serious accident); *Glynn v. Bankers Life and Casualty Co.,* 432 F.Supp.2d 272 (D.Conn.2005) (notwithstanding insured driver's 0.17% BAC, relevant inquiry "is whether the deceased had a subjective expectation of survival, and that such expectation was objectively reasonable, which it is if death is not substantially likely to result from the insured's conduct").

■ Looking to the administrative record, the court concludes that Mr. Tate's death was accidental and therefore a covered event within the meaning of the policy. While the record is limited on Mr.

Tate's subjective expectations, the record reveals that Mr. Tate was familiar with the operation of motorcycles, had no history of driving while intoxicated, and had no moving traffic violations. The record also reveals that Mr. Tate had a BAC of between 0.05 and 0.10% at the time of the accident, representing a slight to moderate level of impairment, and, based upon available statistical evidence, fewer than 1% of intoxicated individuals are involved in serious vehicle accidents. This evidentiary record would strongly support any subjective expectation of survival Mr. Tate may have entertained.

Even though Mr. Tate's subjective intentions are not knowable, the court reaches the same conclusion under a purely objective analysis. A reasonable person in the shoes of Mr. Tate would not have viewed the collision and subsequent death substantially certain to occur. This is so because death is not substantially certain to result in any particular case of driving a motorcycle at excessive speed (90 MPH) while impaired by an alcohol level between 0.05% and 0.10%; and was not substantially certain to have befallen Mr. Tate as he commenced operating the motorcycle.

LINA argues that the Ninth Circuit misapplied the First Circuit's opinion in *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077 (1st Cir.1990) when it decided *Padfield.* More specifically, LINA argues that the applicable test is "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury *as highly likely to occur* as a result of the insured's intentional conduct," (Motion at p. 8:15–18), instead of whether such injury was substantially certain to result. The court rejects this argument for two reasons. First, this court is bound to follow the unequivocal language in *Padfield* concerning the appropriate test. Second, even if

this court applied the "highly likely to occur" formulation, the court would reach the same result. Under the "highly likely" formulation, the court notes that a reasonable person with Mr. Tate's background and characteristics (experience with motorcycles and no history of moving violations or drunk driving, but driving in excess of the speed limit and with a slight to moderate impairment as indicated by a BAC of 0.05 to 0.10%) would not conclude that death is highly likely to occur, particularly where fewer than 1% of all intoxicated drivers are involved in serious injury accidents. AR 209–12.

■ LINA also urges the court to take judicial notice of and apply the statistics from the National Highway Traffic Safety Administration Traffic Safety ("NHTSA") Facts 2006 Data Sheet. (LINA Request for Judicial Notice).[2] The report accounts for California's helmet law and includes statistics which reveal that there were 506 motorcycle fatalities in 2006. Of those, 346 fatalities had no alcohol in their system and 160 deaths had a BAC greater than 0.10%. (Judicial Notice at p. 5). Interpreting these statistics, LINA argues that the court should adopt national statistics and find that 27% of all motorcycle fatalities involved operators who had BAC levels of 0.08% or higher. (Judicial Notice at p. 8). According to LINA, this statistic demonstrates that Mr. Tate's death was substantially likely to occur. LINA's argument is not persuasive because it is based on a statistic that sheds no light on the correlation between driving a motorcycle while under the influence and being involved in a serious injury accident. For example, in the absence of this critical statistic, one logical, but absurd, interpretation of the statistics presented is that sober motorcycle operators are more than twice as likely to die in an accident than

**2.** Plaintiff does not oppose the court taking judicial notice of the report.

alcohol-impaired operators, 346 to 160. More information is required to make an informed analysis of the NHTSA statistics. The court concludes that the NHTSA report does not support LINA's argument that the accident was substantially likely or certain to occur.

Lastly, LINA argues that Mr. Tate's injuries were "highly likely," given his consumption of alcohol and high rate of speed. There are two problems with this argument. First, while there is undisputed evidence that Mr. Tate was traveling at a high rate of speed at the time of the collision and unable to negotiate the curve, there is little evidence quantifying Mr. Tate's precise speed. Kyle Short, a 17-year-old driver approaching the scene of the accident from the opposite direction, estimated that Mr. Tate was traveling at 90 MPH.[3] This may or may not have been an accurate estimate as there is no evidence of an expert on accident reconstruction opining on the collision. Second, even accepting the testimony as accurate, LINA cannot prevail on its claim because death is not the "substantially certain" result of driving 90MPH while moderately impaired by alcohol (0.05–0.10% BAC).

In sum, the court finds that the motorcycle collision and ensuing death of Mr. Tate were the result of an accident as that term has been developed by ERISA common law. The Clerk of Court is instructed to enter judgment in favor of Plaintiff Brettelle and against Defendant LINA.

**IT IS SO ORDERED.**

---

3. The court notes that Mr. Kyle stated about 18 months after the accident that Mr. Tate was traveling at a high speed, not that he was traveling 90 MPH. AR 192.